ORIGINAL

1   CLINTON D. HUBBARD (Cal.Bar No. 071276)
    chubbard@cdh-law.com
2   Law Offices of Clinton D. Hubbard
    4445 Eastgate Mall, Suite 200
3   San Diego, CA 92121
    Tel:  858.467.9140 (Fax: 858.467.9142)
4

5

6   Attorney for Plaintiff Pacific Maritime Freight, Inc.

7

8                    UNITED STATES DISTRICT COURT

9                   SOUTHERN DISTRICT OF CALIFORNIA

10

11  PACIFIC MARITIME FREIGHT, INC.,          Civil Case No.

12               Plaintiff,                  **10 CV 0578    BTM BLM**

13       v.                                  COMPLAINT FOR:

14  SONIA L. FOSTER; THE FOSTER              1. BREACH OF FIDUCIARY DUTY
    GROUP, INC.; and DOES 1 through 10,         (GENERALLY)
15  inclusive,                               2. BREACH OF FIDUCIARY DUTY
                                                (PHANTOM GSA LISTINGS)
16                                           3. BREACH OF THE IMPLIED COVENANT
                                                OF GOOD FAITH AND FAIR DEALING
17               Defendants.                 4. BREACH OF CONTRACT
                                             5. FRAUD
18                                           6. INTENTIONAL INTERFERENCE WITH
                                                PROSPECTIVE ECONOMIC ADVANTAGE
19                                           7. TRADE SECRET MISAPPROPRIATION &
                                                UNFAIR COMPETITION
20                                           8. RESCISSION
                                             9. DECLARATION THAT NO FUTURE
21                                              COMPENSATION DUE TO
                                                DEFENDANTS
22

23       Plaintiff Pacific Maritime Freight, Inc., doing business as "Pacific Tugboat Service,"

24  (hereinafter **"PTS"**), by and through its undersigned attorneys, brings this complaint

25  against Sonia L. Foster and The Foster Group, Inc. (hereinafter often referred to

26  *collectively* as **"Foster"**).

27  ///

28  ///

---

1
COMPLAINT

FILED

2010 MAR 18  PM 3: 06

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY_____DEPUTY



## INTRODUCTION

1.     Plaintiff PTS seeks in this action, *inter alia*, relief for harm caused by Foster's breach of fiduciary duties that occurred in its capacity as PTS's government contracts marketing agent for boat sales, and for misuse of trade secrets and unfair competition that occurred while Foster was still representing and being paid by PTS under contract.   Under Foster's 5-year marketing program PTS has paid to Foster and its designated lobbyists over $1.5 million yet Foster has and is still attempting to destroy PTS's market position and good will and to cause PTS to lose potential contract opportunities.  Foster is contacting PTS's federal government customer and seeking to undermine PTS's relationship and convert those contracting opportunities to itself and its other clients.   Foster abused the trust reposed in it by corruptly scheming against PTS while still under contract to PTS and while still embodying PTS's primary "face" to the relevant Navy and General Services Administration personnel, and causing PTS to be almost evicted from the government commercial sales program. Foster has destroyed nearly all value from PTS's $1.5 million investment in their 5-year marketing program. PTS seeks a return of its investment, as well as the other relief sought hereinbelow.

2.     Foster's other unethical practices detrimental to PTS  include its attempt, while still PTS's trusted agent, to rig the bids on the tug boat sales program so that the Navy would receive an artificially high price from PTS and award at a different price to  a contractor controlled by Foster.  Foster also secretly used PTS's GSA sales list to include goods that PTS was not actually selling but doing so for the purpose of circumventing federal competition regulations for the benefit of Foster's other clients.  In light of Foster's pervasive pattern of corruption and abuse, PTS seeks to rescind their entire contract relationship and put the parties back in their original position with ancillary damages and appropriate equitable relief.

## PARTIES

3.     Plaintiff PTS is a duly organized California corporation (Pacific Maritime Freight, Inc.) with its principal place of business and home office in San Diego,

1   California.   It provides a variety of marine services including towing, freight hauling,

2   barge and tug services, marine construction, and related products.   It also provides

3   substantial services under contracts with the federal government.

4        4.      Defendant Sonia L. Foster is an individual and resident of the State of

5   Maryland.  (Sonia L. Foster will be referred to by her full name or **"Ms. Foster"**.)  PTS is

6   informed and believes, and thereon alleges, that she wholly owns and controls defendant

7   The Foster Group, Inc., a Maryland domestic corporation with its principal place of

8   business in Stevensville, Maryland.  Ms. Foster is a highly sophisticated Washington

9   D.C. "Beltway" consultant specializing in initiating funding and awards to her contractor

10  clients seeking federal government contracts.  Her undertaking to provide these services

11  to PTS is the relationship giving rise to this action.

12       5.      The true names and capacities of defendants sued as DOES 1-10 are

13  unknown to Plaintiff.  Plaintiff will move to amend the complaint to allege their true

14  names or capacities when they have been ascertained.  Plaintiff is informed and believes

15  and on that basis alleges that each fictitious DOE Defendant is in some manner

16  responsible for the acts or omissions alleged, and for the damages claimed, in this

17  complaint.

18       6.      Plaintiff is informed and believes and on that basis alleges that each named

19  Defendant was the agent, servant, employee, partner, or joint venturer of each other

20  Defendant, and that each Defendant was acting within the course and scope of such

21  agency, employment, partnership, or joint venture, and with the consent or the

22  ratification of each other in doing the things alleged here.

23       7.      PTS is informed and believes, and thereon alleges, that there exists such a

24  unity of interest and ownership between defendants Sonia Foster and her solely-owned

25  company The Foster Group, Inc. that there is no practical separation between them, and

26  if the actions set forth herein are treated as those of the Foster Group alone and not the

27  acts of Sonia Foster as well, an inequitable result will follow.   Piercing the "corporate

28  veil" is warranted under the unique circumstances of this case as the defendants have

behaved corruptly and engaged in egregiously bad faith acts and omissions which have resulted in damages to PTS.  With respect to each of the causes of action alleged herein against either defendant the Court is requested to pierce the corporate veil and find defendant Sonia Foster the alter ego of the Foster Group and individually liable for the obligations of the Foster Group.

**JURISDICTION AND VENUE**

8.     This Court has subject matter jurisdiction over this action because the action is between citizens of different states and the amount in controversy exceeds the federal minimum threshold of $75,000 exclusive of interest and costs pursuant to 28 U.S.C. Section 1332.

9.     A substantial portion of the occurrences, transactions, acts, and omissions giving rise to Plaintiffs' claims have occurred, and continue to occur, in San Diego County, California, including but not limited to: the harm and breach of fiduciary duty to PTS whose main offices are in this County; the written contracts at issue were executed in this County; and performance thereunder was intended to and did occur in San Diego County, California.  Venue in this Court is therefore proper pursuant to 28 U.S.C. § 1391(a).

**FACTUAL BACKGROUND**

Subsection hearings:

The PTS-Foster Relationship

The PEO Ships Program

Foster-PTS Program Development

Foster Attempts to Sabotage PTS' GSA List Contract

Foster's GSA List Fabrication - Phantom Competition

Foster Intentionally Damages or Destroys the Tug Boat Program

Foster Intentionally Damages or Destroys the Dive Boat Program

Trade Secret and Confidential Information

### The PTS-Foster Relationship

10.    PTS was introduced to Sonia Foster in 2004 and retained her to provide government contract marketing and other services necessary to sell select boats and craft to the Navy via enrollment in the federal General Services Administration Schedules Program.  Under this Program the GSA establishes long-term government-wide contracts that allow its buyers to acquire a wide array of products and services directly from commercial suppliers, avoiding normal government procurement solicitation procedures. This GSA Schedules Program (also sometimes "Multiple Award Schedules" and "Federal Supply Schedules") consists largely of the Federal Price Lists which form part of the private contractors' GSA contracts.

11.    The product initially discussed was chartering tug boats to the Navy (a maritime lease arrangement).  PTS paid Ms. Foster $2,000/month for these services in late 2004 – early 2005.  This arrangement was memorialized on or about February 3, 2005, in a document provided by Ms. Foster entitled "Subcontractor Agreement", between Foster Group and PTS.   "Client" PTS agreed to compensate Foster at the rate of $2,500/month plus expenses, and with a 2% commission on sales generated through her.  This agreement was modified by three more identical agreement documents over the course of their 5-year relationship with the only difference being that Foster's base compensation escalated over that time, reaching $15,000/month in August 2008.  It was in essence a single multi-year marketing relationship directed at long-term goals not achievable in a single year.  Ms. Foster told PTS that she was sole owner of Foster Group. All significant discussions, representations, and agreements for Foster Group described in this complaint involved Ms. Foster personally.  The person at PTS she most often spoke with was vice-president Stephen Frailey who was in charge of the program.

12.    The agreement document did not describe the details of the services to be provided by Foster Group, and includes only this very general statement:

RECITALS

WHEREAS, the Client desires to engage the services of the Subcontractor to Client in negotiating contracts with the United States Government along with business development and contract negotiations, etc., and the Subcontractor desires to accept such engagement.

NOW THEREFORE, the parties agree as follows:
1.      Statement of Work.  Subcontractor agrees to provide consulting services to the Client with respect to negotiating contracts with the United States Government (collectively, the "Services").

13.     The details of the services the parties agreed Foster would provide, and what Foster actually did provide in their course of dealing over the next five years, include:

a.      Enrolling PTS in the GSA Federal Schedules Program for commercial products and services, in order to allow PTS to sell/lease ship-assistance tug boats and (later) workboats to the Navy through this increasingly important avenue for such sales.

b.      Handling all paperwork and GSA interface required by that program.  This included being designated as PTS's sole point of contract to the GSA for the entire duration of their relationship.  Sonia Foster insisted that she be the only person to handle communication with GSA personnel and auditors, during audits or routine communications, and that she have sole responsibility for processing and updating PTS's GSA Federal Price List.

c.      Formulating and implementing a comprehensive federal sales marketing plan for PTS's sales of tug boats and workboats to the Navy end-users which Foster said it could identify.

d.      Promoting PTS's services and reputation to the relevant Navy program managers and end-users.

e.      Identifying Navy program managers and end-user commands (ordering

activities) that wanted to buy tug boats or workboats off the GSA Schedule; developing, with the aid of retained lobbyists, Congressional earmark or other federal funding specifically targeting the funds for purchase of that product; and working with the Navy program managers and end-users to assure PTS was awarded the contract for which the funds were provided.

f.      Working with the Navy program managers and potential end-users at the inception of this process, introducing them to PTS and its facility and to the actual boat building subcontractor intended to be used, so that the Navy program managers and end-users could strongly support the funding request and would be inclined to select PTS as the future contractor to be paid from the funding Foster was generating for them. Ms. Foster agreed to use her reputation and influence at the program managers and end-user level to generate, as she characterized it, a "cradle to grave" funding stream targeting her client contractors.

g.      Working with key Congressional staff within the normal custom and practice of requesting ear-marks or other funding directed specifically to a project to be included in marked-up funding bills.

h.      Identifying the amount of funds available to the procuring facility for the program and assuring that PTS's bid price does not exceed that amount.  Foster would unilaterally set the price to PTS usually saying this is what you must bid, allowing very little if any deviation by PTS or its subcontractor.

i.      Monitoring and physically handling the Navy's order solicitation process for PTS's program, and drafting PTS's solicitation responses in a timely fashion – culminating in generating a finished solicitation response for PTS to sign and return to Foster to submit (or to submit directly after signing).

14.      Foster directed PTS to pay, in addition to the payments to Foster described above, fees to lobbyist firms that she would select.  Although PTS would sign an agreement with the lobbyist firm directly, Foster would hire and fire/non-renew them at

1   her discretion. These directed payments totaled approximately $500,000 over the entire

2   period.  The purpose was to facilitate the ear-marking process for program funds, and to

3   provide information to Foster as to the status of the program within Congress and

4   within the Navy.

5       15.   Ms. Foster told PTS many times that she had a "100% success rate" for her

6   clients; that every client project that became funded ended up with a contract award to

7   that client.  She attributed this to the high level of good will and trust she had

8   personally generated with the targeted Navy program managers and end-users, and the

9   benefit of getting them involved with the funding request process from the inception,

10  with introductions to the potential contractors.  She told PTS that a Navy representative

11  would usually inspect the facilities of the likely contractors and meet with them prior to

12  supporting the funding request that would get the cycle started.  The representative

13  could be from PEO Ships, PMS325, CCD (Combat Craft Department), or the end-user.

14  And this is the process that occurred for the tug boat and dive boat programs Foster

15  implemented for PTS.

16      16.   Foster said that it would represent only one contractor for each category of

17  sale, such as PTS's tug boats and, eventually, dive boats; and promote only that single

18  contractor to the Navy program managers and end-user.  Foster promised to represent,

19  and said it was representing, only PTS for its two programs.  In light of the large

20  financial investment Foster demanded of PTS for the programs exclusive representation

21  was a crucial premise of the relationship.

22      17.   PTS had no prior experience with the GSA Schedules Program or with

23  selling boats in this fashion; nor had it any experience with Washington D.C. program

24  funding or lobbying.  Ms. Foster touted her extensive expertise in all these areas, as well

25  as her close and influential relationship with key Navy program people.  She

26  demonstrated to PTS substantial input into the acquisition process and privileged

27  access to decision-makers.  For this she demanded from PTS increasingly high fees.

28      18.   The agreement documents granted Foster a 2% commission on these sales.

1   However, for the first 3 tug boats they agreed to reduce the commission to 1% due to the

2   low prices awarded, and this is what was paid.  They agreed that the rate would revert

3   to 2% on the 4th and subsequent tugs.

4        19.    PTS is referred to as the "Client" in the agreement documents.  Foster

5   warrants: " 15. <u>Warranty</u>.  [Foster] warrants to the Client and its customer that services

6   will be performed in a first class, workmanlike manner."

7   **<u>The PEO Ships Program</u>**

8        20.    Foster's expertise and ability to generate good will with the Navy program

9   managers and end-users was particularly relevant in light of the new Navy procurement

10  policy implemented in the targeted program offices, which shifted acquisitions over to

11  the GSA commercial list process (and away from the standard open solicitation

12  procurements of most federal contracting) and also granted more purchasing autonomy

13  to the command.  Foster navigated the intersection of two Navy commands, the GSA

14  Schedules Program, and funding origination.

15       21.    The main purchasing command involved in this action lies within the

16  Navy's <u>Program Executive Office</u>, Ships (PEO Ships).  It was established as part of the

17  realignment of the Secretary of the Navy effective late 2002, to create a stronger

18  business focus with more flexible acquisition management.  Part of the mission is to

19  identify high quality builders to work with the Office and the Navy to provide best value.

20  The mission of the office for Support Ships, Boats, and Craft under the Program

21  Executive Officer ("PMS 325") is delivery of a large number of support ships, boats and

22  craft to operating forces of the U.S. Navy, to the Military Sealift Command, and to

23  foreign military sales customers.   The Program Office handles the acquisition of vessels,

24  boats, and platforms, including "Boats, Craft, and Seaborne Targets," among many

25  other types.

26       22.    Division PMS325G procures U.S. Navy boats and a different activity, the

27  Combatant Craft Department (CCD) of NAVSEA's Carderock Division, NSWCCD

28  Detachment Norfolk, provides life cycle support and manages the boat inventory in

1    support of PMS325.  PMS325G and CCD determine the specific fleet requirements and

2    OPNAV priorities, and execute acquisitions to fill the requirements. These two

3    commands are Foster's primary targets.  PMS325G works with the OPNAV Requirement

4    and Resource Sponsors and executes the boat budget, acquiring boats to fill specific

5    fleet requirements based on priorities set by and funding provided by OPNAV. CCD

6    works with the boat custodians and their chain of command, helping them as they

7    articulate detailed boat operational requirements.  The boat requirements are sometimes

8    filled with existing boat assets, and are sometimes filled with newly acquired boats.

9    CCD also provides acquisition technical support and issues the boats to custodian

10   activities to fill authorized boat allowances.

11          23.    Formerly, boats were typically procured using Small Business Set Aside,

12   Firm Fixed Price contracts. The boat design requirements were defined by fairly detailed

13   drawings and building specifications.   Since approximately 2002 procurement of most

14   boats and small craft has been conducted through commercial acquisition channels

15   using the established contracts on the GSA Schedules Program (Federal Supply

16   Schedules).   The procurement of small quantities for specific users provides

17   opportunities for the designs and configurations to be more specifically tailored to the

18   individual missions of those users.  The premise is that this streamlined acquisition

19   approach reduces acquisition costs, speeds up the process, increases flexibility, and

20   produces "best value."

21          24.    This change in acquisition method provided an opportunity for a private

22   program packager like Foster to identify the need for particular boats, help develop

23   tailored specifications, cost estimates, and funds; then provide those boats via its pre-

24   approved/selected contractors to PEO Ships (PMS325) according to the GSA price

25   schedule in a manner avoiding most of the traditional procurement competition.  Foster

26   also worked closely with CDD.  In some instances, geographical proximity of the

27   shipyard was deemed of high value to the end user or to the originator of the

28   earmark/funding, which further restricted competition.   The ordering activities

1   understand that Foster is often largely responsible for delivering the targeting funding

2   for these purchases.  In summary, it is this group of services that Foster offered,

3   promoted, and provided to PTS and the Navy.  PTS, as the sole client for its two

4   marketing programs, funded nearly all of the development expenses associated with

5   them.

6                      **Foster-PTS Program Development**

7        25.     PTS and Foster started out in 2004-05 working together on a tug boat

8   charter opportunity (a maritime lease) with the Navy end-user, NAVSEA's Northwest

9   Regional Maintenance Command, in which PTS would upgrade old tugs and charter

10  them back to the Navy.  This was later changed in early 2006 to a conversion contract

11  in which PTS upgraded and refurbished the tugs but turned them back to the Navy

12  without a lease.   Foster designated the subcontractor PTS was to use, JM Martinac

13  Shipbuilding Corp. **("Martinac")** of Tacoma, Washington.  It turned out that Martinac

14  was also a client of Foster.  (Due to facility limitations Martinac referred that conversion

15  work to another company but has fully participated on the *new* tug sales program.)

16  Later that year the Navy decided that future tug boat acquisitions under this program

17  would be of new boats only.  In 2007-08 PTS was awarded contracts to construct and

18  deliver 4 new tug boats (the last contact signed August 14, 2008), two of which have

19  been substantially completed to date.  In January 2010 PTS made final delivery of the

20  first tug boat to the Navy, to glowing reviews.  By all accounts the Navy is extremely

21  pleased with the quality of the work and with the program in general.

22        26.     Foster got PTS placed with a GSA commercial product Price List contract in

23  approximately October 2005 and has maintained PTS on the list since then until the

24  events beginning in July 2009 described below.  The tug boats were listed, and so are

25  the dive boats which represent the second program handled by Foster.

26        27.     The Navy ordering activity has said that it is ready to solicit two more tugs

27  under the GSA Schedules Program (#s 5 & 6 in sequence), and Ms. Foster earlier told

28  PTS that PTS should expect to receive the award.  However, that solicitation has been

1  held up, without public explanation, since Foster began scheming to undermine PTS's

2  position in the tug program.

3      28.    On approximately July 1, 2005, Foster and PTS launched a marketing

4  campaign for a second boat product line in addition to the tugs.  Foster doubled its fee

5  accordingly.  Initially this line was to consist of selling fuel oil barges but then was later

6  changed to dive boats because of better opportunities, according to Foster.  Navy dive

7  boats are specialized to assist diving operations.  Foster designated the subcontractor

8  that PTS had to use, the boat builder GEO Shipyard; but Foster later unilaterally

9  dismissed GEO Shipyard and replaced it with builder Metal Shark who became PTS's

10  subcontractor for the dive boat bid in 2009.  Foster prepared the entire proposal

11  document for the dive boat submittal in September 2009.  The Navy representative for

12  the buyer met with Foster, PTS, and Metal Shark to say that they would receive the

13  award but requested some design changes and more information; but then before

14  awarding it added a 3rd boat and re-opened the solicitation.  The award decision has

15  been delayed, without public explanation, in the period since Foster began scheming to

16  undermine PTS's position with the Navy.

17      29.    Foster never complained about PTS's performance or ever asserted any

18  contract breach during their 5-year program.

19                **Foster Attempts to Sabotage PTS's GSA List Contract**

20      30.    Ms. Foster maintained close, private control over PTS's entire GSA

21  relationship.   Ms. Foster would request information from PTS about matters related to

22  the Price List or audit questions but would never allow PTS to meet with the GSA auditor

23  or communicate directly.  Even for audits on PTS's premises Ms. Foster would issue

24  stern instructions for no one else to be in the room or communicate with the auditor.

25  For the entire relationship she demanded and had on file with the GSA a point-of-contact

26  instruction from PTS to the GSA that listed only her.  PTS never saw, or had a clear idea

27  what was on its GSA list, other than that it was to include its general services and the

28  tug boat and the dive boat items.  After some of the on-site GSA audits Ms. Foster made

1    mysterious comments to PTS suggesting she had performed a valuable service finessing

2    some (mysterious) issue with the auditor regarding PTS, but never clarified what this was

3    supposed to mean.  This was in keeping with Ms. Foster's assiduously cultivated air

4    throughout the entire program of control and mystery about the details of how and what

5    exactly she was doing on PTS's behalf.

6         31.    With respect to the GSA Schedules Program in general, the only working

7    contact with PTS that Ms. Foster maintained was Kristin Michaels (sometimes now

8    known by her recently married name Kristin "Anderson"), vice president of accounting

9    and contracts manager, who had become by 2009 PTS's primary contact with Ms. Foster

10   for the GSA and on a range of government contract administration matters.  Ms.

11   Michaels would provide financial and pricing information to Ms. Foster in conjunction

12   with auditing events and government contracts in general. Ms. Michaels departed PTS

13   without notice in January 2010 to go to work for Foster.  She had been developed and

14   supported within PTS for many years, attaining a position of great trust and

15   responsibility at PTS.

16        32.    It now appears clear that in the summer of 2009, Foster decided to jettison

17   PTS with respect to both the tug boat and dive boat programs.  As part of that process

18   Sonia Foster intentionally jeopardized PTS's GSA Price List contract.  This contract is the

19   essential pre-condition to competing in the Navy's PEO 325G tug boat and dive boat

20   programs.  The contract was due to expire in March 2010 with a GSA option to renew,

21   but a long lead time was necessary to go through the GSA's vetting process to be

22   approved for renewal.  This involves audits and general review.  The responsible GSA

23   contract specialist e-mailed Ms. Foster in July 2009 to determine whether PTS desired to

24   have the contract extended and, if so, to make the necessary scheduling arrangements.

25   He contacted only her because she was and had been for the past four years PTS's sole

26   listed point of contact for the GSA.  He gave her a deadline of August 20 for PTS to

27   respond.  She did not respond.  On August 21 he sent to her by FedEx courier another

28   letter, to which she waited until September 17 to respond by telephone.  She told him

1   that "because of non compliance, she no longer represented" PTS and that he must

2   contact PTS directly.  She did not give him the direct contact information and concealed

3   these communications from PTS.

4       33.    Three and a half months later, in January 2010, after several failed

5   attempts to contact PTS the GSA contracts specialist received an e-mail address from the

6   GSA auditor for the PTS account of a new contact, Kristin Michaels vice president of

7   accounting.  However, Ms. Michaels had been invited by Ms. Foster to come to work for

8   her, unknown and undisclosed to PTS by either of them, and in an apparently collusive

9   fashion failed to report this urgent communication from GSA to PTS.  She resigned

10  without warning on January 21.  In light of these circumstances, the GSA has granted

11  PTS a short extension of its GSA contract (to September 20, 2010) to allow time for the

12  normal vetting process that is a pre-condition to an option renewal.

13      34.    It turns out that well before the formal severing of ties between Foster and

14  PTS on January 13, 2010, and before her confederate Ms. Michaels departed to go to

15  work for her on January 21, Ms. Foster bragged to another of her clients about having "a

16  mole" within PTS, whom she identified as Ms. Michaels.  Neither Foster nor Ms. Michaels

17  informed PTS that the GSA was trying to contact PTS or that its entire GSA contract was

18  in jeopardy.  Meanwhile, Foster continued to bill PTS and has asserted billings over this

19  July'09+ period under its contract with PTS, totaling approximately $200,000.  And this

20  was despite the fact that GSA schedule maintenance was Foster's core responsibility and

21  foundation for the entire marketing program.

22      **Foster's GSA List Fabrication – Phantom Competition**

23      35.    After Foster's termination and in the course of review of PTS's Federal Price

24  List (sometimes referred to as "schedule") with the GSA auditor, it has come to light that

25  Foster had placed items on PTS's schedule dated September 10, 2008, that were not

26  being sold by PTS, had nothing to do with PTS's business, and were placed there

27  without PTS's knowledge.  They include but are not limited to: PTS-F8-NE880-OB-001-

28  G [Rigid Hull Inflatable Boat]; PTSLRAD-500X [a sonic repelling device].  PTS is seeking

1   access to the other schedules Foster submitted in its name but it believes, and thereon

2   alleges, that Foster regularly added improper items.

3       36.    PTS is informed and believes, and thereon alleges, that Foster used PTS's

4   schedule for the benefit of other clients of hers who were seeking to sell through the

5   GSA Schedules Program.  A common pre-condition for a government purchase of the

6   schedule is that at least 3 listings for the same product be evaluated.  It appears likely

7   that Foster placed some items on PTS's schedule for the sole purpose of creating

8   phantom competition -- the appearance of 3 listings when in fact PTS's listing was

9   entirely bogus.

10      37.    In one instance Foster approached a different client and explicitly stated

11  she was going to place its GSA-listed product on a different contractor's list because

12  that would somehow help the cause.  That contractor objected and fired her.  That item

13  showed up on PTS's 9/10/08 Price List as listed above, as PTSLRAD-500X.

14      38.    A federal procuring activity must use the GSA multiple award schedule

15  system for commercially available products.  All the Foster programs involve sales

16  within this system, including tug boats and dive boats.  The activity must survey at

17  least three Schedule contractors through the GSA *Advantage!*® online shopping service

18  or review the catalogs or pricelists of at least three Schedule contractors in making their

19  selection.  This requirement is set out in the Federal Acquisition Regulations (FAR), and

20  in particular in Subpart 8.4 – Federal Supply Schedules; and also in the corresponding

21  DoD FAR Supplement (Subpart 208.4 – Federal Supply Schedules).

22      39.    The DoD's explicit purpose in maintaining the minimum 3-contractor

23  review is to enhance competition, as explained in response to this comment generated

24  during the last modifications to these regulations during rulemaking for the pertinent

25  DFARS rule (71 Fed.Reg. 14106, 48 CFR Parts 208 and 216, March 21, 2006):

26
27
28

> 2. Comment: Recommend removing the requirement to obtain three proposals when ordering supplies under GSA's Federal Supply Schedule program, because the requirement is unduly burdensome and administratively wasteful.

> DoD Response: Do not agree. DoD has adopted this policy
> to place the appropriate emphasis on competition and to ensure
> that DoD can continue to use Federal Supply Schedules to meet
> future requirements.

40.    In hindsight, it is now clear to PTS that Foster was using PTS to create phantom competition in (at least) two different ways. One was for Foster to place an item on PTS's Price List without PTS's knowledge, as described above. A second method was to have PTS submit a 1-time bid for an award outside its product line which Foster knew PTS would not win, in order to assist her other clients meet the minimum competition requirements with respect to that item. One example is the Range Support Craft in 2008, an item Foster demanded that PTS bid on and which, it appears, Foster placed on PTS's Price List. Foster dictated the price to be bid by PTS for this item, gave PTS and its Foster-designated potential subcontractor an unrealistically short time to evaluate the bid, and that item was something outside any product line PTS has considered before or since.  PTS complied, viewing this as an unusual "one-off" exercise, and gave it no further thought after Foster told PTS the award went to another bidder. PTS is informed and believes, and thereon alleges, that the other contractor was a Foster client. The Range Support Craft item appears on PTS's September 10, 2008, Federal Price List, which PTS has been able review recently for the first time.

41.    As with the Range Support Craft, Foster from time to time would insist that PTS bid on something outside its normal business line, always on a rush basis with overtones of secrecy and urgency. For example, in September 2008 Foster typed up a bid letter for office printer supplies to NNRSW, Regional Force Protection, for $33,370. It e-mailed this to PTS requesting that PTS print it out on its letterhead, sign, and return to Foster (or possibly submit directly). While this letter quote did not mention the GSA schedule, in retrospect it appears likely to be part of Foster's general phantom competition scheme.

42.    PTS found Foster's occasional "urgent" bid demands inconvenient and long-shots at best. Nothing ever came of them. The primarily impression left with PTS was

1   that that Ms. Foster was merely making a show of her marketing tenacity to impress her

2   high-paying client (PTS), and so PTS tolerated these inconveniences and costs in order

3   to placate her.   It now appears, from the information that has come to light recently,

4   that Foster was using PTS in a fictitious competition scheme.

5       43.    This activity was an unauthorized use of PTS's GSA schedule, a fraudulent

6   waste of PTS's time and resources, and placed PTS in jeopardy of investigation and

7   reputational damage by association due to the unethical, and probably illegal,

8   circumvention of the competition requirements of the GSA schedule procurement

9   process.

10       44.    Further, on information and belief, PTS alleges that Foster was engaging in

11   this practice with most of her clients, using their various schedules to post bogus

12   Federal Price List items in order to create phantom competition sufficient to meet

13   Federal procurement competition requirements.  This scheme would enable Foster to

14   achieve the "100% success rate" that Ms. Foster generally boasted about.  Two phantom

15   high or unqualified listings would satisfy the competition requirement and leave her

16   intended client the winner by default.

17       45.    PTS is informed and believes, and thereupon alleges, that by mid-2009 at

18   the latest Ms. Foster secretly decided to replace PTS with a different contractor client,

19   Maybank Industries, LLC of Charleston, So. Carolina.  She began collaborating with

20   Maybank to take over PTS's position in tug boat and dive boat programs.  PTS was and

21   had always been in complete compliance with its obligations to Foster under these

22   programs and was performing well.  Foster's decision was apparently based on only its

23   belief that the other company presented a more lucrative business opportunity.

24   However, Foster did not disclose its decision to terminate PTS until January 13, 2010.

25   In this six month (or longer) interval Foster continued to collect large fees from PTS who

26   believed it was being exclusively represented by Foster.

27       **Foster Intentionally Damages or Destroys the Tug Boat Program**

28       46.    The 5th and 6th tug boats in the tug boat program are ready to go out for

1    bid to GSA schedule holders, but have been held up without explanation in the Navy's

2    procuring office for the last few months of 2008 and early 2009.  During this period,

3    which is after Ms. Foster first began attempting to cause PTS to lose its GSA schedule

4    contract, she began preparations to eliminate PTS from the tug boat program.  She

5    entered into discussions and an agreement with another shipyard, Maybank Industries,

6    LLC of Charleston, So. Carolina, to be her client for receiving the award of tugs #s 5 & 6.

7    Meanwhile she was collecting large fees to exclusively represent PTS on the tug

8    program.

9         47.     During the week of January 4, 2010, Ms. Foster met twice with PTS's

10   subcontractor and builder of the tugs, Martinac, at the Munro Hotel, Tacoma,

11   Washington.   Martinac was also a client of Foster.   In face-to-face meetings she told

12   Martinac's principals that she was going to make sure that tugs 5 & 6 (that were about

13   to come out to bid) would be awarded to Maybank Industries, LLC as the prime

14   contractor and Martinac as the subcontractor.  She conveyed that she could cause the

15   award to be made to the contractor she selected.  She requested that Martinac facilitate

16   this plan by secretly quoting a price to Maybank Industries but giving PTS a higher

17   price. `Foster knew at the time of her conversation that Martinac was under agreement

18   to team with PTS on tugs 5 & 6, and that she was still working for PTS as her sole client

19   on the tug program (or ought to be), and that PTS believed she was still exclusively

20   representing it on that program.  On January 18, 2010, a boat building subcontractor

21   to Maybank Industries e-mailed Martinac seeking information about physical details of

22   the tug boats PTS and Martinac were building for the Navy.

23        48.     On January 13, 2010, Martinac disclosed to PTS Ms. Foster's conversations

24   of the prior week, stating that its legal counsel advised them that her proposals were

25   probably illegal and that they should report this contact immediately to PTS.  Martinac

26   immediately terminated its relationship with Foster.  Late in the day of the 13th Ms.

27   Foster issued a short no-cause termination e-mail, stating in part, "Additionally, it is

28   with sincere regret that that I terminate services to Pacific Maritime Freight dba Pacific

1   Tugboat Services effective immediately."

2   49.   Ms. Foster thereupon began a campaign of negative marketing against PTS

3   with the Navy.  PTS is informed and believes, and thereon alleges, that she verbally and

4   in writing stated to her Navy contacts that PTS was not in compliance, was not reliable,

5   and was in poor financial condition ("insolvent").  Additionally, she distributed an e-mail

6   on February 18, 2010, to various program personnel at PEO Ships and to other

7   pertinent Navy contacts suggesting that she had filed some kind of request for

8   investigation with the GSA Inspector General's office regarding PTS.  It also suggested

9   that "Mrs. Kristin Anderson" (formerly "Michaels", PTS's V-P of accounting) was

10  somehow involved in this complaint.  Although the e-mail was not particularly coherent,

11  it is clear that Ms. Foster sought to create the impression that PTS (and Martinac who

12  was cited as named in the complaint as well) could not be trusted with the tug program,

13  and the intended and plausible effect would be to stop an award of tugs 5 & 6 to PTS

14  and divert that award to Foster's new team with Maybank Industries.   For good

15  measure Ms. Foster mentioned that the Naval Criminal Investigative Service might be

16  investigating PTS.  These statements are preposterously false.  A JAG inquiry to the GSA

17  office and contact mentioned in the e-mail turned up no sign of any such request for

18  investigation.  Although in theory any citizen can file paperwork asking the GSA to

19  consider investigating something, such a filing per se means nothing.  Ms. Foster has

20  fabricated libelous allegations, dressed up as a pseudo-"investigation", and submitted

21  them to all the key Navy personnel for the tug and dive boat programs with the intended

22  and likely effect of tarnishing PTS's reputation and stopping or delaying award of tugs 5

23  & 6 to PTS.

24  50.   PTS is informed and believes, and thereon alleges, that one of Foster's

25  purposes in keeping her change of allegiance secret from PTS was, in addition to

26  causing PTS to bid high and lose the award, to create an illusion of competition on the

27  tug boat solicitation sufficient to satisfy the minimum 3-bid requirement of the

28  governing regulations and policies.  In contrast, if Martinac were to pull out of its

1  arrangement with PTS at the last minute, PTS might not have had time to find an

2  adequate replacement builder on short notice and therefore not have submitted any bid

3  at all.

## Foster Intentionally Damages or Destroys the Dive Boat Program

5    51.    Most of Foster's actions with respect to the tug boat program affected the

6  dive boat program as well.  Some additional details relating only to the dive boat

7  program are that Foster attempted to sandbag PTS on the bid deadline of January 15,

8  2010, and cause PTS to miss the deadline and therefore be rendered ineligible for

9  award.  The parties' agreement and practice was that Foster would calendar and

10  prepare the paperwork on every contract solicitation out for bid under their two

11  programs.   The dive boat contract had already been bid for and nearly awarded to PTS

12  in the first round, as discussed above, but then went out to bid again with a change in

13  design and an increase from 2 to 3 boats.  Foster prepared all the paperwork and

14  coordinated submittal for PTS's first bid.  The revised bid was due on Friday, January

15  15. PTS contacted Foster several times in the interim reminding it that the bid was due

16  and asking if there was further information needed from PTS. As the deadline grew

17  closer Mr. Frailey of PTS sent more requests for assurance that the bid submittal was

18  on track and had not "dropped between the cracks."  It was not until two days prior to

19  the bid deadline that Foster informed PTS that Foster did not intend to submit PTS's bid

20  contrary to the usual procedure.

21    52.    Mr. Frailey received a disturbing call from Ms. Foster on the evening of

22  Tuesday January 12 in which she indicated that she was at some point soon going to

23  terminate her relationship with PTS.  The proffered rationale seemed to have something

24  to do with PTS's financial condition and nothing else.  This seemed odd because PTS

25  was in good financial condition and she had not expressed such concern before.  It

26  seemed like a pretext to Mr. Frailey.  The next day, Wednesday the 13th, he emailed her

27  reminding her that Foster was obligated to submit the dive boat re-bid that was due in

28  two days.  After another telephone conversation she e-mailed him that evening her

1    intent to immediately terminate their relationship on the tug and dive boat projects

2    effective the 13th, and stated in effect that he was on his own for the bid due on the

3    15th. She did not offer to assist.

4         53.    Two days was not enough time under the circumstances to properly

5    assemble and submit the bid, considering that PTS had been relying on Foster to

6    assemble all bid proposals throughout their entire relationship. Foster possessed much

7    of the key documentation, and PTS was unsure of the procedural details such as exactly

8    where to deliver the proposal and how. Foster intended to have PTS miss the dive boat

9    bid deadline and would not have warned PTS that Foster was not going to submit the

10   proposal on its behalf but for Mr. Frailey's persistent communications early that week

11   which forced the issue. Further evidence of this intent was Foster's decision to withhold

12   assistance to PTS regarding the substance or procedural mechanics of the submittal

13   process.

14        54.    Foster was under contract to PTS all this time, collecting $15,000/month

15   for performing these services, and Foster has since billed *an additional $90,000* to PTS

16   as a post-contract termination bonus fee that Ms. Foster asserts she is entitled to for

17   her services prior to termination. These services pertained to a period in which she

18   secretly schemed against PTS while enjoying its complete trust and confidence. Her

19   demonstrated greed and ethical obtuseness, while particularly astonishing in this

20   instance, is woven throughout their entire relationship.

21        55.    PTS missed the original Friday January 15 bid deadline. In its state of

22   shock and confusion it was unaware of the new bid delivery mechanics and new point of

23   contact for the government, and transmitted the bid to the wrong location. However, at

24   the last minute the Navy extended the deadline and PTS eventually transmitted its bid

25   to the correct location. There has been no word yet on the Navy's award decision.

26        56.    As described with respect to the tug boat program, Ms. Foster has engaged

27   in a negative marketing campaign directed to her group of close Navy program contacts.

28   She has sought to undo the 5 years of marketing investment by destroying PTS's

1    reputation and good will with PEO Ships and pertinent end-user facilities.

2         57.    With respect to the dive boat program Ms. Foster has gone beyond a

3    campaign of generally trashing of PTS's standing and ability to perform, to specifically

4    interfering with its subcontractor relationship.  In February 2010 Ms. Foster repeatedly

5    directed and pressured PTS's boat building subcontractor Metal Shark to not honor its

6    bid to PTS to perform the dive boat contract, and to boycott PTS on future Navy

7    opportunities.  Metal Shark is a boat builder that is also a client of Foster and naturally

8    is under great economic pressure to comply.  Nevertheless PTS has attempted to

9    persuade Metal Shark to honor its commitments at least on the current project out for

10   bid, and it may be that Metal Shark will do so.  But Foster wields enormous authority

11   over her clients, via practical control over the Navy's contract award process, and it

12   remains doubtful whether any client company can withstand the ruthless economic

13   pressure Foster can bring to bear upon those dependent on her.  Foster and its clients

14   perform most or nearly all of certain categories of this small craft work for the Navy.

15                    **Trade Secret and Confidential Information**

16        58.    The record is barren of any complaint voiced by Foster regarding PTS's

17   performance or behavior, at least before Foster began conniving against PTS in 2009.

18   Even after that time Foster has not put in an e-mail or in other documented form (of

19   which PTS is aware) any significant criticism let alone an allegation of breach by PTS.

20        59.    Six days after Ms. Foster's termination e-mail of 1/13/10, PTS's president

21   Ted Griffith (who had had very little contact with Foster), forwarded a courteous letter

22   requesting an explanation for the termination and asking for an opportunity to fix any

23   problem there might be.  His January 19, 2010, letter:

24              Dear Ms. Foster,

25              I am President of PTS.  I have reviewed your January 13
             "termination" e-mail to Steve Frailey.  I am now personally
26           investigating this matter and will do everything in my power to
             address any of your concerns.  Until I read your email I had not
27           heard of any problem whatsoever that you had ever expressed
             regarding PTS's relationship with you.  Therefore this comes as
28           quite a shock and out of the blue.  I expect as matter of basic

                                          22
                                       COMPLAINT

1   business courtesy and ethics that you, our long-term partner in
2   these programs, give me the opportunity to explain and rectify any
    misunderstandings.

3   **Please immediately provide me by e-mail with a written**
4   **summary of why you want to terminate PTS from the tug and**
    **the dive boat programs, including any concerns and questions**
5   **you may have.**   While I realize you have had one telephone
    conversation with Steve about this, it appears that the discussion
6   surprised him and he is not able to provide me a coherent business
    rationale or explanation for your action.  Therefore, I respectfully
7   request that you provide me a written explanation and afford us an
    opportunity to repair the perception or circumstances giving rise to
8   this situation.   This is all the more puzzling in light of our
    spectacularly successful milestone accomplishment last Friday –
9   passing the acceptance trial for the first tug (subject to minor
10  punch list items).  The Navy customer was obviously extremely
    pleased with our product as you saw yourself.

11  This is a very serious matter and I expect your full and immediate
12  attention and cooperation.

13  Thank you,
    Ted Griffith,
14  CEO and President

15
16      60.    Foster has never responded with an explanation for termination nor has its

17  attorney who, 3 weeks later, wrote a letter to PTS saying that Mr. Griffith's letter was

18  received and denying that Foster terminated PTS for an improper reason.   Foster has

    failed to explain its behavior in circumstances in which a guiltless actor, or ethical
19
    business person, would explain and justify such serious detrimental action taken against
20
    a 5-year, trusting client.  This silence compels the conclusion that there is no
21
    justification.
22
        61.    On January 28, 2010, having received no response to its letter of the 19th,
23
    PTS issued a longer letter to Foster setting out its belief that Foster was working against
24
    it to divert work to other clients and using its trade secret information.  PTS also
25
    requested Foster's assistance during this transition and for copies of the files, as
26
    excerpted as follows:
27
        1. Request For Immediate Turn-Over Assistance On The Navy Tug
28      Program.

Provide status turn-over information regarding the Navy tug program.
Provide a written status report on every aspect of the tug program
pertinent to PTS.  Include a list of your contacts on this program so PTS
may introduce itself and get up to speed.  Of particular importance is
information related to the status of the program audit, including any
pending audit, by the GSA or Navy.

2.  Request For Immediate Turn-Over Assistance On The Dive Boat
Program.
Provide status turn-over information regarding the dive boat program.
Provide a written status report on every aspect of the dive boat program
pertinent to PTS.  Include a list of your contacts on this program so PTS
may introduce itself and get up to speed.

3.  All Your Correspondence And Records Pertinent To PTS's Projects
Provide all of all documents generated by you or received by you,
pertinent to PTS, on the tug boat and dive boat programs while you were
under contract with PTS.  This is work product paid for by PTS to which
it is entitled.  This includes but is not limited to e-mail (with
attachments) to/from the Government.

4.  All documents, e-mail, and electronically stored information related to
PTS.
You are obligated immediately to return all paperwork, files, documents,
e-mail, notes, and electronically stored information you acquired in the
course of your relationship with PTS.  This includes copies.  It would be
illegal for you to keep or use any proprietary or trade secret information
or media.

5.  Do Not Divulge Trade Secret Or Confidential Information, Or Use It
Against PTS.

You have extensive knowledge of PTS's trade secrets and confidential
business information regarding the Navy tug program and the Navy dive
boat program.  We trusted you completely and gave you access to our
most confidential records.  (You also reviewed them pursuant to your
professed interest in buying an equity position in PTS.)  You had primary
responsibility for administering the tug and dive boat programs.

You have boasted to Martinac that you had "a mole" inside PTS, and that
it was our VP of accounting and contracts, Kristin Andersen, and said
she was giving you confidential information.   It was during this period
that you were attempting to subvert PTS's position under the tug and
dive boat programs, and you were in constant contact with Kristin.  Now
Kristin has mysteriously and abruptly resigned from PTS to go work
supposedly somewhere in "New York" starting February 1st but she
would not identify the new employer.  Our concern is that you [have]
been and intend to collaborate with Kristin to compete against PTS on
the very programs on which both of you were working for us; and in fact
both of you at this point know more about the administrative details and
procedures of the tug program than any single one of us here.  We

trusted you totally.  You and Kristin have been given access to some of our key financial and pricing and trade secret information regarding these projects.  Both you and Kristin resigned without notice, within a very short time of each other, leaving us in a state of crisis.  This may have been intentional.  Accordingly,  PTS demands:

    a.    That you state whether you have made arrangements to hire Kristin (either as an employee or "independent contractor").

    b.    That you agree to not hire Kristin within the next six months.  (Her and your knowledge of PTS and the tug and dive boat projects make use and disclosure of trade secrets inevitable. This will also allow PTS time to adjust to your near-simultaneous departures.)

    c.    That you never divulge PTS's trade secret or confidential information to anyone, or use it to compete against PTS with respect to the tug and dive boat programs.  This includes all financial, pricing, management, and technical information you have seen regarding PTS.

    d.    That you not compete against PTS on tugs #5 and #6 in the tug program.  This includes not aiding any other contractor to win this work.

    e.    That you not compete against PTS on the dive boat program for the pending solicitation.  This includes not aiding any other contractor to win this work.

   . . .

    62.    Foster has refused to provide any of the assistance, materials, or assurances requested by PTS in its above quoted letter.   Foster's only response was the denial by its attorney in a short letter to PTS dated February 11, 2010, which stated, regarding those requests:

    ... The Foster Group has strived to comply with the law on both programs, and your allegations to the contrary are unsubstantiated and unfortunate.  Further, The Foster Group is under no obligation to comply with your letter's list of demands relating to the production of documents and reports to PTS.  The Foster Group understands its obligations under the agreement, and does not intend to divulge any trade secrets or confidential business information to your competitors for the purpose of competing with PTS.  ...

    63.    Foster's refusal to assist PTS during this transition phase or provide documents and information during the turnover reflect its animus, continuing breach of

1   the essence of their agreement, the lack of good will and cooperation, and indicate the

2   likelihood of an ongoing cover-up.  In summary by category, (1) Foster refuses to aid PTS

3   to get up to speed on the tug program by providing pertinent documents and contacts.

4   Foster was working as PTS's agent and confidante on these programs, and PTS was

5   wholly funding this effort.  Foster shared gross sales on a percentage commission basis

6   and received a large monthly fee plus substantial monthly expenses.  Ms. Foster refuses

7   to provide information regarding her GSA file and notes for PTS.  The denial of assistance

8   with the dive boats under request (2) invokes the same considerations.  PTS as the fully

9   funding client is entitled to all PTS-related documentation generated on its behalf by its

10  agent and representative Foster, pursuant to requests (3) and (4).  PTS provided Foster

11  with all technical drawings and design plans for the tug boats which Foster is not

12  entitled to keep.

13      64.     Item (5) asks Foster to not divulge trade secrets or use them against PTS.

14  PTS's counsel splits hairs in its response here: it says Foster will not divulge trade

15  secrets to PTS's competitors but <u>does not say</u> that Foster will not use them <u>itself</u> in

16  putting together competing bids with PTS's competitors.  That is the crux of the problem

17  -- Foster's use of PTS's inside business and financial information to construct

18  competitive teams on the two programs, from which Foster would likely receive

19  compensation and share in revenues on its normal commission basis.  Foster hired Ms.

20  Michaels and necessarily will use the confidential information Ms. Michaels possesses by

21  virtue of her sensitive position with PTS and similar position with Foster.  Foster, via her

22  counsel's letter reply, in effect states its intention to violate each of the sub-requests

23  (5)(a) through (e) (other than divulging trade secret information to a competitor).

24      65.     By virtue of her central role in PTS's affairs in these programs Ms. Foster

25  was routinely provided or reviewed PTS's trade secret and confidential information, as set

26  out above.  But Ms. Foster drilled even deeper into PTS's affairs.  She requested and

27  gained access to all of PTS's financial and business records in approximately August –

28  September 2009 under the guise that she was interested in investing in PTS.  PTS and

1    one of its owners had been negotiating with another party regarding a possible buy-out

2    of his position, and an extensive due diligence file had been compiled by their CPAs and

3    others.  Ms. Foster requested permission to review that file and examined it closely.

4    Again, this was in the period when she had already decided to terminate PTS.

5         66.    Kristin Michaels' sudden departure and collaboration with Ms. Foster

6    presents a sad footnote to these proceedings.  In essence, Ms. Foster induced this young

7    (27 year old) employee to turn against the only employer she had known in her short

8    career, one who had treated her as a member of the inner "PTS family" circle and who

9    had nurtured her education and development to a high level of responsibility and trust.

10   She was originally hired into the PTS organization by its senior partner, President and

11   CEO Ted Griffith, when she was in her late teens with no post-high school training.

12   Both Kristin and John Anderson, her significant-other and future husband, had recently

13   moved to California from Arizona and had limited job prospects.   Over time both Kristin

14   and Mr. Anderson received substantial financial assistance from PTS toward education,

15   licensing, and housing needs – and recent wedding gifts.  Mr. Anderson was originally

16   hired to an entry level position and, with company support, eventually became a licensed

17   "master of vessels," a highly coveted and respected position in the maritime industry.

18        67.    Kristin rose to a department head and officer within PTS with largely

19   unsupervised autonomy over a wide range of business and financial matters including

20   banking, various accounts, human resources, employee benefits, federal, state and local

21   regulatory compliance on a wide range of issues.  She eventually held the positions of

22   vice president of accounting, and contracts manager.  Kristin was the sole point of

23   contact for many of PTS's government compliance sites and maintained access and

24   password information that no one else knew.   With respect to the GSA contract, Kristin

25   was Ms. Foster's only routine working contact with PTS.  As described above, Ms. Foster

26   was the sole point of contact and "face" of PTS to the GSA.  By 2009, Kristin had become

27   PTS's primary information contact with Ms. Foster for the GSA contract and for other

28   contract administration and financial matters.  For example, Kristin would provide

1   financial and pricing information to Ms. Foster as requested by Ms. Foster in response to

2   GSA information requests.

3        68.    When Kristin departed on January 22, 2010, to go to work for Ms. Foster

4   she gave no prior notice, did not disclose passwords to government sites or other internal

5   computer programs, had not disclosed to PTS that the GSA was urgently trying to

6   contact PTS because the time for renewing the GSA Federal Price List contract was

7   expiring; nor did she provide any other assistance to aid in the transition.  She left no

8   forwarding address or contact information.  She did not reveal she was going to work for

9   Foster. Her actions and omissions, in combination with Ms. Foster's earlier touting of

10   Kristin as her "mole" within PTS, compel the conclusion that all of PTS's key financial,

11   proprietary, and trade secret information is now available to her new employer.

12        69.    PTS's trade secrets and confidential information of which Foster is in

13   possession includes but is not limited to:  PTS's internal cost structure for both

14   programs; PTS's basic financial statements;  strengths and weaknesses of PTS's facility

15   and boat building operations; the marketing plan developed with Foster regarding the

16   two lines of business; what the Navy customer has communicated to both Foster as

17   PTS's agent and to PTS directly concerning  the strengths and weaknesses in its

18   proposals; other funding opportunities and needs for these two Navy programs (this is

19   information paid for and generated by PTS's fees and payments); GSA concerns and

20   program status; technical drawings and design plans for the tug boats; and related

21   matters.

22        70.    The series of agreement documents executed by the parties bars Foster

23   from using any information provided to it by PTS, and designates all such information to

24   be the property of PTS:

25           14 . Use of Information. [Foster] agrees that the Client's property
        or any idea, data, program, technical, business or other intangible

26           information, however conveyed, and any document, print, tape,
        disk, tool, or other tangible information owned or controlled by

27           Client, and provided to, or acquired by [Foster]  under or in
        contemplation of this Agreement (hereinafter "Information") **is the**

28           **exclusive property of the Client.  [Foster] shall keep**

**Information confidential and use it only in performing the
Services under this Agreement** and obligate its employees,
subcontractors, and other working for it to do so also.  The
foregoing shall not apply to such portions of the Information
supplied by Client which (i) are already in [Foster's] possession or
of which it is aware, (ii) are or become generally available to the
public through no fault or action by [Foster], (iii) are or become
available to [Foster] on a nonconfidential basis from a source,
other than the Client, which, after due inquiry, is not legally
prohibited from disclosing such Information, or (iv) [Foster] is
compelled to disclose by competent legal authority.  [Emphasis
added.]
This clause makes clear Foster's obligation to return its Client's
files and the obligation of Foster not to use anything from those
files for its own account.

**FIRST CLAIM FOR RELIEF:   BREACH OF FIDUCIARY DUTY (GENERALLY)**

(As Against All Defendants)

71.     PTS realleges and incorporates herein by reference the allegations of
Paragraphs 1 through 70, *supra.*

72.     By virtue of their central role and key responsibility in PTS's federal boat
sales program and under their related agreements, Sonia Foster and Foster Group
occupied a position of trust and confidence with PTS.  By virtue of their position of trust,
the Foster parties owed fiduciary duties of loyalty and confidentiality to PTS.

73.     Under these circumstances, trust and confidence reasonably could be and
was placed by PTS in the integrity and fidelity of the Foster parties.

74.     Despite their fiduciary duties, Foster parties misused their position of trust
to further their own interests at the expense of PTS in doing the things alleged
hereinabove.  Some of these actions include but are not limited to:

a.     Foster abused the trust reposed in it by corruptly scheming against PTS
while still under contract to PTS and while still embodying PTS's primary "face" to the
relevant Navy and General Services Administration personnel, and causing PTS to be
almost evicted from the government commercial sales program.

b.     Foster attempted to cause PTS to miss the bid deadline for the dive boat

opportunity, while secretly working against PTS with a competitor – all while Foster was exclusively representing PTS on the dive boat program.

c.    Foster attempted to cause PTS's tug boat subcontractor to breach its contract with PTS and collude with Foster against it to cause the pending award to go to a competitor -- all while Foster was exclusively representing PTS for the tug boat program.

d.    Foster attempted, while still PTS's trusted agent, to rig the bids on the tug boat sales program so that the Navy would receive an artificially high price from PTS and award at a different price to a contractor controlled by Foster.

e.    Foster has interfered with PTS's subcontractor relationships on both the tug boat and dive boat programs, seeking to induce them to breach their subcontract agreements or otherwise behave dishonestly or uncooperatively toward PTS.

f.    Foster has destroyed nearly all value from PTS's $1.5 million investment in their 5-year boat sales marketing program.  These actions include negative marketing against PTS to its government customers and the spreading of libelous and damaging information directly to the key Navy contacts, verbally and by e-mail.  In light of Foster's strong influence with key Navy contacts, the damage to PTS's position is complete.

g.    Foster induced PTS's vice president of accounting to leave PTS and come to work for Foster without notice and in a manner calculated to maximize damage to PTS's operations and provide greater access to PTS's confidential information.

h.    Foster continues to withheld documentation, files, and transition assistance from PTS after it formally terminated PTS, in a manner intended and likely to cause harm to PTS – despite the fact that PTS funded the entire 5-year marketing program

i.    Foster is using PTS's trade secrets and confidential marketing information to compete directly against PTS with other contractors.

75.     By engaging in the acts described above, Foster parties misused their position of trust and confidence, and their access to PTS's confidential information, to further their own interests; and accordingly breached their fiduciary duties to PTS.

76.     As a direct result of Foster parties' breach of their fiduciary duties, PTS has suffered harm in an amount to be proven at trial.  At the very least, Foster should disgorge the funds paid by PTS and those expended under Foster's direction throughout their relationship, as well as unjust enrichment.

77.     As a direct proximate cause of defendants' breaches, Plaintiff suffered damages as follows: the loss of most of its investment in the marketing program, in an amount exceeding $1,000,000; its lost opportunity costs; lost profit on likely future business; and as otherwise to be proven at trial.

78.     The Foster parties' breach of fiduciary duties was willful and malicious and justifies an award of punitive damages.

**SECOND CLAIM FOR RELIEF:   BREACH OF FIDUCIARY DUTY (PHANTOM GSA LISTINGS)**

(As Against All Defendants)

79.     PTS realleges and incorporates herein by reference the allegations of Paragraphs 1 through 78, *supra.*

80.     By virtue of their central role and key responsibility in PTS's federal boat sales program and under their related agreements, Sonia Foster and Foster Group occupied a position of trust and confidence with PTS.  By virtue of their position of trust, the Foster parties owed fiduciary duties of loyalty and confidentiality to PTS.

81.     Under these circumstances, trust and confidence reasonably could be and was placed by PTS in the integrity and fidelity of the Foster parties.

82.     Despite their fiduciary duties, Foster parties misused their position of trust to further their own interests at the expense of PTS in doing the things alleged hereinabove.  These actions are described in the Factual Background subsection

hereinabove, entitled " **Foster's GSA List Fabrication – Phantom Competition**".

83.   As described, Foster was using and abusing PTS's GSA contract Price List to create phantom competition in at least two different ways.  One was for Foster to place an item on PTS's Price List without PTS's knowledge.   A common pre-condition for a government purchase of the schedule is that at least 3 listings for the same product be evaluated.  It appears likely that Foster placed some items on PTS's schedule for the sole purpose of creating phantom competition -- the appearance of 3 listings when in fact PTS's listing was entirely bogus.  A second method was to have PTS submit a 1-time bid for an award outside its product line which Foster knew PTS would not win, in order to assist her other clients meet the minimum competition requirements with respect to that item.

84.   This activity was an unauthorized use of PTS's GSA schedule, a fraudulent waste of PTS's time and resources, and placed PTS in jeopardy of investigation and reputational damage by association due to the unethical, and probably illegal, circumvention of the competition requirements of the GSA schedule procurement process.   Further, on information and belief, PTS alleges that Foster was engaging in this practice on a widespread basis with other clients.

85.   By engaging in the acts described above, Foster parties misused their position of trust and confidence, and their access to PTS's confidential information, to further their own interests; and accordingly breached their fiduciary duties to PTS.

86.   As a direct result of Foster parties' breach of their fiduciary duties, PTS has suffered harm in an amount to be proven at trial.  At the very least, Foster should disgorge the funds paid by PTS and those expended under Foster's direction throughout their relationship, as well as unjust enrichment.  Foster should not be allowed to retain funds achieved by a pattern of fraudulent competition which victimized the government and squandered PTS's time and resources.  PTS seeks an accounting and disgorgement order with respect to funds received (via commissions or fees from other clients) related

1    to Foster's unauthorized use of its Federal GSA Price List.

2        87.     The Foster parties' breach of fiduciary duties was willful and malicious and

3    justifies an award of punitive damages.

### THIRD CLAIM FOR RELIEF:    BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

(As Against All Defendants)

8        88.     PTS realleges and incorporates herein by reference the allegations of

9    Paragraphs 1 through 87, *supra.*

10        89.     The federal boat sales agreements between PTS and Foster include an

11    implied covenant of good faith and fair dealing between the parties. This implied

12    covenant imposed a duty on Foster not to do anything to deprive PTS of the benefit of

13    those agreements.

14        90.     Foster's conduct, described above, was consciously and deliberately

15    designed to frustrate the benefits of the agreement.  In the end, it resulted in destruction

16    of the essential purpose of the agreements.  Independently of any breach of an express

17    agreement term, Foster has breached the implied covenant of good faith and fair dealing.

18        91.     As a direct proximate cause of defendants' breaches, Plaintiff suffered

19    damages as follows: the loss of most of its investment in the marketing program, in an

20    amount exceeding $1,000,000; its lost opportunity costs; lost profit on likely future

21    business; and as otherwise to be proven at trial.

### FOURTH CLAIM FOR RELIEF:    BREACH OF CONTRACT

(As Against All Defendants)

25        92.     PTS realleges and incorporates herein by reference the allegations of

26    Paragraphs 1 through 91, *supra.*

27        93.     As described hereinabove, from 2005 through 2010 the parties operated

28    under a series of 4 nearly identical written agreements and oral agreements regarding

their multi-year boat sales marketing effort.  The statement of work set out in the written agreements was so vague as to be useless to a determination of the parties' agreement, and their actual course of dealing and correspondence sets out their agreed terms as described in the Factual Background subsection hereinabove, entitled "**The PTS-Foster Relationship**".  In general terms, Foster agreed to implement PTS's federal boat marketing program with the Navy on an exclusive representation basis for PTS's two boat categories, tug boats and dive boats.  PTS agreed to pay to Foster a large monthly fee, expenses, associated lobbying fees, and a commission on sales.

94.    Their agreement documents provided: "15. <u>Warranty</u>.  [Foster] warrants to the Client and its customer that services will be performed in a first class, workmanlike manner."

95.    On or about July 2009, at the latest, Foster materially breached their agreement by, in, and among other ways, scheming against PTS on both boat programs and conspiring with its competitors to divert the pending awards away from PTS.  Further detail is set forth hereinabove and in the First Cause of Action for Breach of Fiduciary Duty.  Further, Foster abused PTS's Federal Price List by placing unauthorized items on it as part of Foster's corrupt phantom competition scheme.

96.    Foster has destroyed nearly all value from PTS's $1.5 million investment in their 5-year boat sales marketing program.  These actions include negative marketing against PTS to the government customers, spreading of libelous and damaging information directly to the key Navy contacts, verbally and by e-mail.  In light of Foster's strong influence with key Navy contacts, the damage to PTS's position is complete.

97.    Foster failed to perform its essential services "in a first class, workmanlike manner."

98.    Plaintiff has performed all obligations under said contract except those obligations plaintiff was prevented or excused from performing.

99.    As a direct proximate cause of defendants' breaches, Plaintiff suffered

damages as follows: the loss of most of its investment in the marketing program, in an amount exceeding $1,000,000; its lost opportunity costs; lost profit on likely future business; and as otherwise to be proven at trial.

100.   Plaintiff is entitled to attorneys fees by agreement or statute, according to proof.

### FIFTH CLAIM FOR RELIEF: FRAUD

(As Against All Defendants)

101.   PTS realleges and incorporates herein by reference the allegations of Paragraphs 1 through 100, *supra*.

102.   On or about July 2009, at the latest, Foster began to scheme against PTS by denying to the GSA that Foster was representing PTS (and jeopardizing its GSA contract) and collaborating with competitors to divert boat building awards away from PTS. However, Foster lied to PTS and concealed material facts in order to induce PTS to continue to pay Foster's $15,000/month fee and expenses, and to continue to provide information to Foster which Foster could use to its competitive advantage.

103.   Ms. Foster did not tell PTS that she was arranging to terminate it, and represented in innumerable instances in their normal working relationship that she was working for PTS and that Foster was still doing everything necessary to make PTS's program a success. By doing this Foster induced PTS to pay nearly another $90,000 in fees for six month's service, and afforded PTS less time to make other arrangements.

104.   Foster made these false "business as usual" representations knowing of their falsity, and it intentionally concealed the fact that Foster was working against PTS, not for it. Foster intended that PTS would rely on these affirmative and concealed falsehoods, which were material.

105.   Plaintiff reasonably relied on these false representations and fraudulent concealments in continuing to pay Foster the monthly program fees and costs, despite

the fact Foster was covertly working for PTS's competitors, and PTS continued to provide its confidential information and business plans to Foster.

106.   As a direct proximate cause of defendants' breaches, Plaintiff suffered damages as follows: the loss of most of its investment in the marketing program, in an amount exceeding $1,000,000; its lost opportunity costs; lost profit on likely future business; and as otherwise to be proven at trial.

107.   The Foster parties' breach of fiduciary duties was willful and malicious and justifies an award of punitive damages.

**SIXTH CLAIM FOR RELIEF:  INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**

(As Against All Defendants)

108.   PTS realleges and incorporates herein by reference the allegations of Paragraphs 1 through 107, *supra.*

109.   Foster set out methodically to destroy PTS's economic relationships with the Navy and PTS's subcontractors.  It did this for the purpose of removing PTS as a competitor to allow Foster to team with Maybank Industries in PTS's stead.  Foster breached its fiduciary and contract obligations to PTS to achieve this end, and used PTS's trade secrets against it.

110.   By these means Foster has intentionally interfered with PTS's existing and prospective economic advantage with the Navy under the tug boat and dive boat programs.  Additionally, its negative marketing campaign to the Navy directed against PTS has corroded PTS's good will and reputation with the relevant commands and ordering activities.   Foster has destroyed PTS's competitive advantage in procuring the pending tug and dive boat awards and similar solicitations in the future as well.  Further, Foster is likely causing delay of the currently pending awards in both programs in order to position her new clients for receipt of those awards.

111.   The Foster parties were and are aware of the existence of the agreements between PTS and its two subcontractor builders, Martinac for the tug boats and Metal Shark for the dive boats, yet sought to induce these subcontractors to either not honor their commitments to PTS or issue a high bid to PTS for the purpose of causing PTS to lose the award.  In particular, in February and March 2010 Ms. Foster repeatedly directed and pressured PTS's boat building subcontractor Metal Shark to not honor its bid to PTS to perform the dive boat contract, and to boycott PTS on future Navy opportunities.  Metal Shark is a boat builder that is also a client of Foster and naturally is under great economic pressure to comply.  Nevertheless PTS has attempted to persuade Metal Shark to honor its commitments at least on the current project out for bid, and it may be that Metal Shark will do so.  But Ms. Foster wields enormous authority over her clients, via practical control over the Navy's contract award process, and it remains doubtful whether any client company can withstand the powerful economic pressure Ms. Foster can bring to bear upon those dependent on her.  Foster Group and its clients perform most or nearly all of certain categories of this small craft work for the Navy.

112.   Finally, if Metal Shark does not uphold its obligation to support PTS on its bid then PTS will be deprived of the opportunity to win and perform those contracts for the Navy.  Foster controls a large portion of the other work performed by Metal Shark and so has the power to cause a breach of contract upon threat of loss of future business.

113.   Defendants' conduct has harmed PTS by imposing additional expenses on it and by causing an erosion of PTS's reputation and goodwill among the Navy managers and end-users of its programs.

114.   Defendants' conduct in this regard was and is intentional, wrongful, and designed to disrupt PTS's business.

115.   Defendants' conduct may have destroyed PTS's opportunity to derive any

future revenue from its two federal boat sales programs or to recoup the substantial investment it made in those programs. PTS's $1.5 million investment has been rendered nugatory.

116.   As a direct proximate cause of defendants' breaches, Plaintiff suffered damages as follows: loss most of its investment in the marketing program, in an amount exceeding $1,000,000; its lost opportunity costs; lost profit on likely future business; and as otherwise to be proven at trial.

117.   The aforementioned acts were oppressive, malicious and/or fraudulent, thereby justifying an award of punitive damages.

**SEVENTH CLAIM FOR RELIEF:  TRADE SECRET MISAPPROPRIATION AND UNFAIR COMPETITION**

(As Against All Defendants)

118.   PTS realleges and incorporates herein by reference the allegations of Paragraphs 1 through 117, *supra.*

119.   PTS possesses trades secrets in its federal boat sales programs as defined by California's Uniform Trade Secrets Act, Civil Code Sections 3426-3426.11.

120.   These trade secrets are set out hereinabove and include but are not limited to:(i) key contacts and emerging boat buying needs within the Navy's PEO Ships organization (including PMS325G and PMS325I), the Navy's NSWCCD organization, and for the specific program managers and end-users of the dive boat and tug boat lines which PTS provides; (ii) information about PTS operations, including business and marketing for these programs; (iii) PTS's  financial plan and resource allocation for these programs; (iv) the nature and cost justification for PTS's GSA Price List schedule; (v) PTS's internal costs and pricing for these programs; (vi) PTS's agreements with its key subcontractors and their cost structure for these programs; and other matters.

121.   The Trade Secrets derive independent economic value, actual or potential,

from not being generally known to the public or to other persons who can obtain economic value from their disclosure or use.

122.   PTS has taken reasonable measures to maintain the secrecy of the Trade Secrets, including but not limited to maintaining the information in a secure manner in PTS facilities expressly requiring the maintenance of confidentiality with respect to PTS's Trade Secrets.

123.   Defendants have misappropriated the Trade Secrets by: (1) acquiring the Trade Secrets with knowledge or reason to know that they were acquired by improper means; (2) disclosing, using and/or threatening to use the Trade Secrets, in breach of their fiduciary duties and without the express or implied consent of PTS; and (3) use of those Trade Secrets to seek to undermine PTS's relationships in it federal boat sales program and compete directly against PTS.

124.   Defendants, and each of them, have been using the Trade Secrets with knowledge or reason to know that their knowledge of the Trade Secrets was (1) acquired under circumstances giving rise to a duty to maintain their secrecy or limit their use, or (2) derived from or through a person who owed a duty to PTS to maintain the confidentiality of the information.

125.   PTS has suffered damages, and Defendants have been unjustly enriched in an amount to be proven at trial, as a direct result of Defendants' misappropriation of the Trade Secrets.

126.   As a direct proximate cause of defendants' breaches, Plaintiff suffered damages as follows: loss most of its investment in the marketing program, in an amount exceeding $1,000,000; its lost opportunity costs; lost profit on likely future business; and as otherwise to be proven at trial.

127.   Foster has, by the actions described hereinabove in this complaint, engaged in unfair and wrongful competition and, further, has violated California's Unfair

1   Competition Act. Foster engaged in a serious of deeply dishonest and unfair business

2   practices.  These practices offend established public policy, they are immoral, unethical,

3   oppressive, and unscrupulous.

4       128.   Defendants' misappropriation of PTS's Trade Secrets has been willful and

5   malicious and entitles PTS to exemplary damages pursuant to Civil Code Section

6   3426.3(c) and an award of its reasonable attorneys' fees and costs pursuant to Civil Code

7   Section 3426.4.

8   **EIGHTH CLAIM FOR RELIEF:  RESCISSION**

9   (As Against All Defendants)

10      129.   PTS realleges and incorporates herein by reference the allegations of

11  Paragraphs 1 through 128, *supra*.

12

13      130.   PTS's performance of its obligation to pay compensation to Foster was

14  conditioned on Foster's faithful and good faith development of the federal boat sales

15  program for PTS's tug boat and dive boat ventures.  This condition precedent failed when

16  Foster secretly and corruptly was undermining PTS's position in the Program and

17  destroying its good will, all the while still under contract and receiving $15,000/month

18  fees. Foster continued to attempt to damage or destroy PTS's position by libeling it to the

19  Navy customer and others in the industry, and unfairly using PTS's trade secrets to

20  compete against it.  This constituted a total failure of consideration and a material

21  breach of their contract.   Further, Foster has repudiated the essential goal of their 5-

22  year relationship, the marketing of PTS exclusively for the two programs.   This

23  repudiation took the form of denial of assistance to PTS, active sabotage of PTS's

24  position, and violation of its fiduciary duty to not interfere with PTS's market position

25  with the Navy.

26      131.   Furthermore, Foster's fraud in 2009 and 2010, in promising to work for

27  PTS in order to induce the making of continued $15,000/month payments to Foster,

28  while in fact corruptly working to destroy PTS's position, renders their agreement void.

132.   The series of contracts in effect between PTS and Foster from 2004 to 2010 were essentially one and the same agreement with the same purpose and obligations, except for Foster's monthly compensation which increased from $2,000 to $15,000 over the years.  The purpose was to carry out a multi-year marketing campaign to secure federal boat sales for PTS to the Navy.

133.   Despite PTS's demand it do so, Foster has failed and refused carry out its essential obligations under their agreements causing a total failure of consideration, and has expressly and by implication repudiated these essential obligations.  At the time of Foster's repudiation, PTS had performed all of the terms and conditions on its part to be done and performed, and was ready, able, and willing to continue performance.

134.   Foster has destroyed nearly all value from PTS's $1.5 million investment in their 5-year boat sales marketing program.  These actions include negative marketing against PTS to the government customers, spreading of libelous and damaging information directly to the key Navy contacts, verbally and by e-mail.  In light of Foster's strong influence with key Navy contacts, the damage to PTS's position is complete.

135.   Foster is not entitled to credit for the tug boat contracts awarded to date. Foster's actions constitute thoroughly corrupt, unethical, oppressive, and unscrupulous behavior toward PTS, toward whom it owed a fiduciary duty of honesty and care. Accordingly, PTS seeks an order of this Court that Foster is barred from any equitable relief or amelioration in fashioning a remedy or granting relief in this action.  Specifically, Foster's unconscionable conduct gives rise to the defense of unclean hands and bars relief for it, whether in reformation, unjust enrichment, or any other form of equity.

136.   Notice of rescission and offer to restore consideration:  the  service of this complaint is to serve as PTS's notice and offer.

///

///

///

**NINTH CLAIM FOR RELIEF: DECLARATION THAT NO FUTURE COMPENSATION DUE TO DEFENDANTS**

(As Against All Defendants)

137.   PTS realleges and incorporates herein by reference the allegations of Paragraphs 1 through 136, *supra.*

138.   Due to Foster's actions set forth hereinabove, PTS is entitled to relief from payment to Foster of any past or future fees, commissions, or expenses in any way related to their contracts or the federal boat sales program.

139.   Foster is entitled to no equitable amelioration of the relief sought herein. Foster's actions constitute thoroughly corrupt, unethical, oppressive, and unscrupulous behavior toward PTS, toward whom it owed a fiduciary duty of honesty and care. Accordingly, PTS seeks an order of this Court that Foster is barred from any equitable relief or amelioration in fashioning a remedy or granting relief in this action.  Specifically, Foster's unconscionable conduct gives rise to the defense of unclean hands and bars relief for it, whether in reformation, unjust enrichment, or any other form of equity.

**PRAYER FOR RELIEF**

WHEREFORE Plaintiff prays for judgment against Defendants, and each of them, as follows:

1.     For an award of damages in an amount of at least $1,000,000, and as otherwise proven at trial;

2.     For other relief including but not limited to disgorgement of any amounts by which Defendants have been unjustly enriched as a result of their wrongful conduct, including commissions earned off phantom listings on PTS's GSA price list;

3.     For an order that all agreements between PTS and Defendants are rescinded, and that Defendants return to PTS all sums paid to Defendants or to the lobbyists in Defendants' marketing program, without any equitable relief or off-set (as

1    Defendants are barred by the doctrine of unclean hands from any such equitable relief or

2    off-set);

3        4.    For a declaration and order that nothing is owing or will become due by

4    PTS to Defendants under or related to their contracts herein (including future fees,

5    commission, or expenses), and that Defendants are barred by the doctrine of unclean

6    hands from any equitable relief or off-set;

7        5.    For an order requiring that Defendants not use any of PTS's trade secrets

8    or information that is proprietary and confidential; that Defendants return to PTS all

9    such materials; and that in addition Defendants return all other materials of any nature

10   acquired from PTS or from the Government concerning PTS in the course of their

11   relationship;

12       6.    For an order that Defendants identify for PTS all communications and

13   contacts between Defendants and the Government customer and related individuals

14   regarding PTS's projects for which Defendants were hired by PTS to handle, including

15   any post-termination contacts that referred to PTS sufficient for PTS to counteract

16   Defendant's negative statements;

17       7.    For an order that Defendants not compete or team with others against PTS

18   on the tug boat program for tugs numbers 5 and 6; or for any contract within the dive

19   boat program for a period of 18 months;

20       8.    For an order that Defendants not hire, retain, or contact PTS's ex-vice

21   president of accounting and government contracts for a period of 18 months;

22       9.    For an order that Foster is barred from any equitable relief or consideration

23   in this matter because it comes before the Court with unclean hands;

24       10.   For temporary and preliminary injunctions to effectuate the relief sought

25   herein;

26       11.   For punitive damages;

---

43
COMPLAINT

1    12.    For attorneys' fees and costs; and

2    13.    For all other relief the Court deems just and proper.

3

4   Dated:  March 18 2010                     Respectfully submitted,

5

6

7                                             CLINTON D. HUBBARD
                                              Attorney for Plaintiff Pacific Maritime Freight,
8                                             Inc.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

%JS 44   (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
PACIFIC MARITIME FREIGHT, INC.

**DEFENDANTS**
SONIA L. FOSTER; THE FOSTER GROUP, INC.; and DOES 1 through 10

**(b)** County of Residence of First Listed Plaintiff   San Diego Co., CA
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed   Anne Arundel Co., MD
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Clinton D. Hubbard, Law Offices of Clinton D. Hubbard, 4445 Eastgate Mall, Ste. 200, San Diego  CA 92121  tel: 858.663.5189

Attorneys (If Known)

'10 CV 0578   BTM BLM

FILED
2010 MAR 18  PH 3: 06
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY_____ DEPUTY

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question
(U.S. Government Not a Party)

☒ 4 Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **LABOR** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | **IMMIGRATION** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 462 Naturalization Application | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
29 USC 1332, diversity

Brief description of cause:
Breach of contract

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

**DEMAND $**
1,000,000.00

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY
(See instructions)   JUDGE _____   DOCKET NUMBER _____

DATE
03/18/2010

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # 11300   AMOUNT $350   APPLYING IFP   3/18/10   JUDGE _____   MAG. JUDGE _____



```
Court Name: USDC California Southern
Division: 3
Receipt Number: CAS011300
Cashier ID: kdelabar
Transaction Date: 03/18/2010
Payer Name: LAW OFC CLINTON HUBBARD
--------------------------------
CIVIL FILING FEE
 For: PFC MARITIME FREIGHT V. FOSTER
 Case/Party: D-CAS-3-10-CV-000578-001
 Amount:        $350.00
--------------------------------
CHECK
 Check/Money Order Num: 09882
 Amt Tendered:  $350.00
--------------------------------
 Total Due:     $350.00
 Total Tendered: $350.00
 Change Amt:     $0.00


 There will be a fee of $45.00
 charged for any returned check.
```