1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10
11

PACIFIC MARITIME FREIGHT, INC.,

CASE NO. 10-cv-0578-BTM-BLM

12

Plaintiffs,

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS**

v.

13

SONIA L. FOSTER; THE FOSTER

14

GROUP, INC.;and DOES 1 through 10, inclusive

15

Defendants.

16

Defendants Sonia L. Foster and The Foster Group, Inc. have moved to dismiss the

17

complaint [Doc. 4].  For the following reasons, the Motion to Dismiss is **GRANTED in part**

18

and **DENIED in part**.

19
20

## I.  BACKGROUND

21

The Court only recites the allegations in the Complaint that are necessary for the

22

resolution of the pending Motion to Dismiss.  The Court's recitation of the alleged facts are

23

taken from the Complaint and are not factual findings.

24

Beginning in 2004, Plaintiff Pacific Maritime Freight, Inc. (d/b/a Pacific Tugboat

25

Service, hereinafter "PTS") employed the services of Defendants Sonia L. Foster and The

26

Foster Group, Inc. to negotiate contracts with the Navy under the General Services

27

Administration Schedules Program ("GSA").  (Compl. ¶ 10.)  PTS had no experience with the

28

GSA and was not familiar with its complicated procedures.  (Compl. ¶ 53.)  Ms. Foster is the

sole owner of The Foster Group and she became PTS's sole point of contact with the GSA program, never allowing PTS to communicate with the GSA directly. (Compl. ¶¶11,13, 30.) Beginning in 2004, PTS paid Ms. Foster $2000 per month, and based on a February 2005 contract, Foster was paid $2500 per month plus a 2% commission on sales procured through her. (Compl. ¶ 11.) Foster's compensation was renegotiated several times, reaching $15,000 per month in August 2008. (Id.) Foster agreed to exclusively represent PTS. (Compl. ¶ 16.) All "significant discussions, representations, and agreements for Foster Group . . . involved Ms. Foster personally" and Ms. Foster ascribed her success to the good will and trust that she had personally generated with the Navy. (Compl. ¶¶ 11, 15.) PTS described this as a "marketing" program. (Compl. ¶ 13.)

As part of this marketing program, Foster secured for PTS a GSA Price List contract, which made PTS eligible to bid on contracts with the Navy. (Compl. ¶ 26.) Foster also secured for PTS contracts for the procurement of tug boats and dive boats. (Compl. ¶¶ 25-28.) In July 2009, however, Foster failed to make efforts to renew PTS's GSA Price List contract. (Compl. ¶ 32.) On September 17, 2009 Foster called the GSA contract specialist and told him that "because of non compliance, she no longer represented" PTS. (Id.) Foster formally terminated the contract with PTS on January 13, 2010. (Compl. ¶ 48.) Between September 2009 and January 2010, Foster continued to assure PTS that she was marketing them to the Navy and she continued to collect monthly fees for her services, totaling about $200,000. (Compl. ¶¶ 34, 104.) After Foster and PTS severed ties, PTS did not know who to contact in the Navy about renewing contracts, but the deadline for bids was extended so that PTS could submit their bids. (Compl. ¶¶ 53, 55.) Since the termination of the contract, PTS has not lost any contracts for Navy work, but some awards have been delayed. (Compl. ¶ 46.) Foster claims entitlement to a termination bonus fee in the amount of $90,000. (Compl. ¶ 54.)

After Foster terminated the contract, she contacted the Navy and reported that PTS was uncooperative, unreliable, and insolvent. (Compl. ¶ 49.) Foster also suggested to the Navy that the Naval Criminal Investigative Service was investigating PTS, even though a

1   JAG inquiry revealed this to be untrue.  (Id.)  She also pressured one of PTS's
2   subcontractors, Metal Shark, to submit a high bid so that PTS would not be competitive
3   against her new client.  (Compl. ¶ 57.)  PTS fears that Metal Shark will fail to perform and
4   that the Navy will no longer award them contracts.  (Compl. ¶ 57.)  Though PTS has not yet
5   lost any Navy contracts and subcontractors like Metal Shark have not yet repudiated, PTS
6   has incurred expenses repairing its relationships with the Navy and their subcontractors.
7   (Compl. ¶ 113.)

8        After Foster terminated the contract, PTS also discovered what it described as
9   "phantom GSA listings."  (Compl. ¶ 35.)  Foster had placed items on PTS's GSA Price List
10  that were not sold by PTS and had nothing to do with PTS's business, like a sonic repelling
11  device.  (Id.)  Foster would also occasionally pressure PTS to submit one-time bids for
12  contracts outside of their product line, causing PTS to incur costs attendant to preparing the
13  bids.  (Compl. ¶¶ 40, 43.)  PTS suspects that the phony bids were submitted to create the
14  illusion of competition, because Department of Defense guidelines require three bids on a
15  product before a contract is awarded.  (Compl.  ¶ 44.)

16       After Foster terminated the contract, PTS contacted Foster about retrieving trade-
17  secret information that she had gathered throughout their contractual relationship.  (Compl.
18  ¶ 61.)  In a letter dated February 11, 2010, Foster refused to return the trade-secret
19  information, declaring that The Foster Group would not divulge trade secrets to competitors.
20  (Compl. ¶ 62.)  PTS notes that such a promise would only prevent Foster from sharing trade
21  secrets with competitors, but Foster is free to use PTS's trade secrets while preparing bids
22  for the competitors.  (Compl. ¶ 64.)

23       The Complaint alleges nine claims against Sonia Foster, The Foster Group, and ten
24  Doe defendants: (1) breach of fiduciary duty (generally), (2) breach of fiduciary duty
25  (phantom GSA listings), (3) breach of the implied covenant of good faith and fair dealing, (4)
26  breach of contract, (5) fraud, (6) intentional interference with prospective economic
27  advantage, (7) trade-secret misappropriation and unfair competition, (8) rescission, and (9)
28  a declaration that no future compensation is due to defendants.  Plaintiffs also seek a variety

3

10cv0578 BTM (BLM)

of equitable remedies including an injunction.  Defendants have moved to dismiss all claims for lack of subject-matter jurisdiction, to dismiss all nine claims against Ms. Foster in her individual capacity, and to dismiss claim five for fraud and claim six for intentional interference with prospective economic advantage against The Foster Group, Inc.

## II.  LEGAL STANDARD

Under Federal Rule of Civil Procedure 8(a)(2), the plaintiff is required only to set forth a "short and plain statement of the claim showing that the pleader is entitled to relief," and "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).  When reviewing a motion to dismiss, the allegations of material fact in plaintiff's complaint are taken as true and construed in the light most favorable to the plaintiff.  See Parks Sch. of Bus., Inc. v. Symington, 51 F.3d 1480, 1484 (9th Cir. 1995).  But only factual allegations must be accepted as true—not legal conclusions.  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id.  Although detailed factual allegations are not required, the factual allegations "must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.  Furthermore, "only a complaint that states a plausible claim for relief survives a motion to dismiss."  Iqbal, 129 S. Ct. at 1949.

For claims of fraud, Federal Rules of Civil Procedure 9(b) requires that the plaintiff "must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  Normally, this particularity requires the "times, dates, places, benefits received, and other details of the alleged fraudulent activity."  Neubronner v. Milken, 6 F.3d 666, 672 (9th Cir. 1993).  However, the standard of particularity "may be relaxed with respect to matters within the opposing party's knowledge."  Id.  In such cases, the plaintiff "should include the misrepresentations themselves with particularity and, where possible, the roles of the individual defendants in the misrepresentations."  Moore v. Kayport Package Exp., Inc., 885 F.2d 531, 540 (9th Cir. 1989).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## III.  DISCUSSION

### A.  Issue of Doe Defendants Is Moot

Defendants assert that the inclusion of Doe defendants presumptively destroys diversity.[1]  But after Defendants filed their motion, Plaintiff voluntarily dismissed all Doe defendants [Doc. 5].  The inclusion of the Doe defendants was the sole basis for the Defendants' 12(b)(1) motion to dismiss, and their dismissal perfects diversity.  See Galt G/S v. JSS Scandinavia, 142 F.3d 1150, 1154 (9th Cir. 1998) ("Rule 21 specifically allows for the dismissal of parties at *any stage of the action*.  There is no requirement that diversity exist at the time of the filing of the complaint . . . . [I]t is well settled that Rule 21 invests district courts with authority to allow a dispensable non-diverse party to be dropped at any time, even after judgment has been rendered.") (internal quotation marks and citations omitted).  Accordingly, the motion is **DENIED** as moot.

### B.  Fraud Claim

Defendants assert that the Plaintiff's fraud claim is not distinct from their breach of contract claim, and that even if it is, it is not pleaded with sufficient particularity under Federal Rules of Civil Procedure 9(b).

//

//

---

[1]The inclusion of Doe defendants does not presumptively destroy diversity. Defendants rely on outdated precedents inconsistent with Lindley v. General Elec. Co., 780 F.2d 797 (9th Cir. 1986).  In Lindley, the Ninth Circuit held that Doe defendant statutes are part of state substantive law that should be applied in diversity cases under the Erie doctrine. Id. at 800-01.  Hawaii cases (which have interpreted the Hawaii rule on Doe defendants to be the same as the California statute) have held that the inclusion of Doe defendants does not presumptively destroy diversity, but that the plaintiff runs the risk of the statute of limitations expiring if a non-diverse Doe defendant is discovered and the case must be refiled in state court.  Macheras v. Center Art Galleries-Hawaii, 776 F. Supp. 1436, 1440 (D. Haw. 1991); Fat T v. Aloha Tower Associates Piers 7, 8, and 9, 172 F.R.D. 411, 414 (D. Haw. 1996).  Disallowing a presumption of non-diversity for Doe defendants in 28 U.S.C. § 1332 actions is consistent with recent revisions to 28 U.S.C. § 1441, which states that for purposes of removal jurisdiction "the citizenship of defendants sued under fictitious names shall be disregarded."

1.      The Fraud Claim Is Pleaded With Particularity

"The elements of fraud, which give rise to the tort action for deceit, are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." Lazar v. Superior Court, 12 Cal.4th 631, 909 P.2d 981 (1996).  Each element of fraud must be pled with particularity under Rule 9(b).

Foster was the "sole point of contact" with the GSA Program.  (Compl. ¶ 13.)  PTS was not privy to the details of negotiations between Foster and the Navy.  (Compl. ¶ 30.) Foster so completely controlled negotiations that after Foster and PTS severed ties, PTS did not know who to contact in the Navy about renewing contracts.  (Compl. ¶ 53.)  The allegedly phony bids and phantom competition were not discovered until after Foster and PTS severed ties.  (Compl. ¶ 35.)  All of the alleged misrepresentations were made during Foster's contacts with GSA program personnel, and because Foster was the sole point of contact and PTS had nothing to do with the process, the details of the alleged misrepresentations are exclusively within Foster's knowledge.  PTS is thus subject to the relaxed 9(b) standard.

Under the relaxed Rule 9(b) standard, PTS has pled the misrepresentations themselves with sufficient particularity.  The misrepresentations at issue involve Foster assuring PTS that she was marketing them to the GSA program when she was not doing so. Defendants dispute the generality of the description of the complaint, which identifies the time of the misrepresentation as being "on or about July 2009."  (Compl. ¶ 102.)  Earlier in the complaint PTS is more specific, describing that in July 2009 the GSA contract specialist contacted Foster about renewing the GSA Price List contract.  (Compl. ¶ 32.)  Foster did not respond until September 17, 2009, when she told the GSA contract specialist that she no longer represented PTS.  (Id.)  Foster concealed the contact (or lack thereof) from PTS, and PTS reasonably relied on Foster's misrepresentation that business was going as usual by continuing to pay Ms. Foster her fees until the contract was formally terminated on January 13, 2009.  (Compl. ¶¶ 34, 102.)  By pleading the elements of fraud and the who, what, when, and how of the misrepresentations, PTS has sufficiently fulfilled the standard of Rule 9(b) and

1    given notice of their claim.

2

3    2.      Distinctness From Breach-of-Contract Claim

4           In addition to challenging whether Plaintiff pleaded its claim with particularity,

5    Defendants also contend that the fraud claim is indistinct from Plaintiff's breach-of-contract

6    claim.

7           Defendant relies on Hunter v. Up-Right, Inc., 6 Cal. 4th 1174, 1182 (1993), where the

8    California Supreme Court "declined to extend tort remedies for breach of the good faith

9    covenant in a contract employment."   In Hunter, an employee suffered constructive

10   termination without cause, and in addition to a wrongful termination claim brought a fraud

11   claim based on a misrepresentation that there had been a meeting preceding his termination

12   when there in fact had not.   Id. at 1179.  Beyond the numerous self described limitations in

13   Hunter,[2] Defendants' reliance on this case is misplaced.  The essence of the Hunter decision

14   is that there was no fraud independent of the breach of contract because the elements of an

15   independent fraud claim were not fulfilled: "It cannot be said that Hunter relied to his

16   detriment on the misrepresentation in suffering constructive termination.   Thus, the fraud

17   claim here is without substance." Id. at 1184.  The damage suffered by the plaintiff in Hunter

18   was not the result of reliance on a misrepresentation, but rather simply the result of the

19   defendant's breach of contract.[3]

20          The damage claimed by Plaintiff in this case, however, was in part the result of

21   justifiable reliance on Defendants' alleged misrepresentations.  As discussed in the preceding

22   section, Foster made misrepresentations about her performance that she knew to be false

23   in order to secure payment from Plaintiff.  Plaintiff relied on Foster's misrepresentation that

24   _____

25          [2]The Hunter Court noted limitations based on the "fundamentally contractual"
     employment relationship, the necessity of employer discretion, and the exclusive remedy
26   provisions of the workers' compensation system.  Hunter, 6 Cal. 4th at 1181-82.

27          [3]The same can be said for Defendants' other authority, Applied Equipment Corp. v.
     Litton Saudi Arabia Ltd., 7 Cal. 4th 503, 515 (1994): "Conduct amounting to a breach of
28   contract becomes tortious only when it also violates an independent duty arising from
     principles of tort law."  Such a duty, of course, would be violated by conduct fulfilling all of the
     elements of fraud.

she was still working to secure contracts for Plaintiff by continuing to pay her monthly fees. Plaintiff's reliance was justifiable because for several years Foster had been active and successful in securing contracts. Plaintiff's justifiable reliance was damaging because Plaintiff paid $90,000 over six months without receiving any benefit from Defendants. Unlike Hunter, all of the elements of Plaintiff's fraud claim are fulfilled. Accordingly, Defendants' motion to dismiss the fraud claim against The Foster Group, Inc. is **DENIED**.

## C. Intentional Interference with Prospective Economic Advantage Claim

Defendants assert that Plaintiff has not sufficiently pled its Intentional Interference with Prospective Economic Advantage ("IIPEA") claim. An IIPEA claim consists of six elements: "(1) an economic relationship between broker and vendor or broker and vendee containing the probability of future economic benefit to the broker, (2) knowledge by the defendant of the existence of the relationship, (3) intentional acts on the part of the defendant designed to disrupt the relationship, (4) actual disruption of the relationship, (5) damages to the plaintiff proximately caused by the acts of the defendant" and (6) "conduct that was wrongful by some legal measure other than the fact of interference itself." Della Penna v. Toyota Motor Sales, U.S.A., Inc., 11 Cal. 4th 376, 389, 393 (1995). Defendants assert that Plaintiff failed to plead the fifth element, actual economic harm.

Defendants correctly assert that PTS has not yet lost any Navy contracts, and that its subcontractors have not yet betrayed PTS. (Pl.'s Opp'n, 11:9-19.) In other words, PTS has not yet sustained any damages. Consequential damages, however, are also recoverable in an IIPEA action. Restatement (Second) of Torts § 774A(1)(b) (1979).

According to the Restatement, one who intentionally interferes with prospective economic advantage can be held liable for "consequential losses" and even "actual harm to reputation." Id. PTS has pled consequential losses that have stemmed from attempts to preempt any loss of contracts, alleging that it has incurred "additional expenses" in an effort to repair its relationship with the Navy. (Compl. ¶ 113.) The Restatement position has been adopted in California. See Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134,

1156-64 (2003).  <u>See also</u> <u>Drouet v. Moulton</u>, 245 Cal. App. 2d 667, 672 (1966) (allowing

recovery on IIPEA claim for consequential and reputational damages).

Plaintiff has pled consequential damages in support of its IIPEA claim.  Accordingly,

the Court **DENIES** Defendants' motion to dismiss Plaintiff's IIPEA claim against The Foster

Group.

**D. Claims Against Ms. Foster in Her Individual Capacity**

Although Ms. Foster was not a party to the contract,  Plaintiff has pleaded an alter-ego

theory of liability against her.  Defendants assert that Plaintiff has not properly pleaded an

alter-ego theory of liability, so all the claims against Ms. Foster in her individual capacity

should be dismissed.  The Court first addresses the elements of alter-ego liability, then

discusses alter-ego liability has been pled with respect to each claim.

1.    <u>Alter-Ego Liability</u>

Alter-ego liability allows a plaintiff to "pierce the corporate veil" and hold a corporate

actor or parent corporation liable for the conduct of the corporation or subsidiary.  <u>Stark v.</u>

<u>Coker</u>, 20 Cal. 2d 839, 845 (1942).   Disregarding the corporate form, however, is an

"extreme remedy, sparingly used."  <u>Sonora Diamond Corp. v. Superior Court</u>, 83 Cal. App.

4th 523, 538 (2000).  As such, alter-ego liability is only employed "in narrowly defined

circumstances and only when the ends of justice so require."  <u>Mesler v. Bragg Management</u>

<u>Co.</u>, 39 Cal. 3d 290, 301 (1985).  To properly plead an alter-ego theory of liability, a plaintiff

must plead the elements of the theory and factors to support those elements.  The two

elements are "(1) that there be such unity of interest and ownership that the separate

personalities of the corporation and the individual no longer exist and (2) that, if the acts are

treated as those of the corporation alone, an inequitable result will follow."  <u>Automotriz Del</u>

<u>Golfo De California S. A. De C. V. v. Resnick</u>, 47 Cal. 2d 792, 796 (1957).  Factors that can

be used to support the first element, unity of interest, include commingling of funds, failure

to maintain minutes or adequate corporate records, identification of the equitable owners with

1   the domination and control of the two entities, the use of the same office or business

2   locations, the identical equitable ownership of the two entities, the use of a corporation as a

3   mere shell, instrumentality or conduit for a single venture or the business of an individual, and

4   the failure to adequately capitalize a corporation.  Associated Vendors, Inc. v. Oakland Meat

5   Co., 210 Cal. App. 2d 825, 838-40 (1962).  The second element requires that an inequitable

6   result occur by the recognition of the corporate form.  Sonora Diamond Corp., 83 Cal. App.

7   4th at 539.

8         Plaintiff has pled the elements of alter-ego liability, alleging the "unity of interest" and

9   "no practical separation" between Ms. Foster and The Foster Group for the first element and

10  the danger that treating the actions as those of The Foster Group alone will create "an

11  inequitable result" for the second element.  (Compl. ¶ 7).[4]  Plaintiff pleads enough factors to

12  support the unity-of-interest element, but the second element of an inequitable result is not

13  satisfied for every claim.

14

15         i.      Unity of Interest

16        Defendants erroneously rely on a case decided at the summary judgment stage where

17  none of the factors indicating alter-ego status were included in any allegation.  Wady v.

18  Provident Life and Accident Ins. Co. of America, 216 F. Supp. 2d 1060, 1067 (C.D. Cal.

19  2002).  Wady has been specifically identified as unhelpful for determining the sufficiency of

20  a pleading for a motion to dismiss.  Monaco v. Liberty Life Assur. Co., No. C06-07021, 2007

21  WL 1140460, at *6 (N.D. Cal. Apr. 17, 2007).  Instead, cases resolving a 12(b)(6) motion to

22  dismiss should be examined for precedential value.  The identification of the elements of

23  alter-ego liability plus two or three factors has been held sufficient to defeat a 12(b)(6) motion

24  to dismiss.  Federal Reserve Bank of San Francisco v. HK Systems, No. C-95-1190, 1997

25  WL 227955, at *6 (N.D. Cal. Apr. 24, 1997).  In HK Systems, the plaintiff pled the factors of

26

27        [4]Defendants' cases, which fail to even state these elements of an alter-ego theory, are
   empty criticisms.  See Hokama v. E.F. Hutton & Co., Inc., 566 F.Supp. 636, 647 (C.D. Cal.
28  1983) (dismissing alter-ego theory for failing to even state the elements of the theory);
   Hockey v. Medhekar, 30 F.Supp.2d 1209, 1211 n.1 (N.D. Cal. 1998) (same).

10cv0578 BTM (BLM)

domination and control, disregard for the corporate form, and undercapitalization, and this was enough to defeat a 12(b)(6) motion to dismiss. <u>Id.</u>; <u>see also</u> <u>Axon Solutions, Inc. v. San Diego Data Processing Corp.</u>, No. 09 CV 2543, 2010 WL 1797028, at *3 (S.D. Cal. May 4, 2010) (denying motion to dismiss alter-ego theory when plaintiff pled commingling of funds, undercapitalization, and representation by one entity that it is liable for the other's debts); <u>Resnick</u>, 47 Cal. 2d at 796-97 (finding unity of interest based on failure to issue stock and undercapitalization).

In this case, PTS has pled commingling of funds and domination and control.  At the beginning of the relationship between Plaintiff and Defendants in late 2004 to early 2005, PTS made payments directly to Ms. Foster, suggesting a commingling of funds between Ms. Foster and The Foster Group.  (Compl. ¶ 11.)  <u>See</u> <u>New Cingular Wireless Services, Inc. v. McCormick</u>, No. 2:07-cv-02213, 2008 WL 4283526, at *5 (E.D. Cal. Sept. 11, 2008) (observing that payments for services of a corporation made out to an individual constituted commingling of funds that could support a finding of alter-ego liability).  Ms. Foster is the sole owner of The Foster Group, and she exclusively handled all interactions with the Navy and GSA herself, indicating her domination and control of The Foster Group.  (Compl. ¶¶ 11,13.)  Ms. Foster also attributed her success to the trust and good will that she has built up with the Navy personally, and that she uses her personal reputation and influence, indicating that she treats The Foster Group as a personal extension.  (Compl. ¶¶ 15, 13.)  <u>See</u> <u>Kirby Morgan Dive Systems v. Hydrospace Ltd.</u>, No. CV 09-4934, 2010 WL 234791, at *5 (C.D. Cal. Jan. 13, 2010) (affirming an arbitration award based partly on alter-ego liability where sole ownership of the company constituted unity of interest).  Sole ownership alone is often enough to defeat a motion to dismiss, and when taken with the commingling of funds, PTS has sufficiently pled a unity of interest between Ms. Foster and The Foster Group, Inc.  <u>See</u> <u>Paul v. Palm Springs Homes Inc.</u>, 192 Cal. App. 2d 858, 863 (1961) (holding that sole ownership was enough to show unity of interest to state a cause of action under alter-ego liability); <u>Viera v. Chehaiber</u>, No. ED CV:08-00182, 2010 WL 960347, at *3 (C.D. Cal. Mar. 16, 2010) (same).

ii.     Inequitable Result

PTS has not pled for every claim how recognizing the corporate form of The Foster Group, Inc. promotes injustice.  PTS does allege numerous instances of bad-faith conduct, including misrepresentation and willful breach.  And while California courts generally require evidence of some bad-faith conduct to fulfill the second prong of alter-ego liability, that bad-faith conduct must make it inequitable to recognize the corporate form.  Mid-Century Ins. Co. v. Gardner, 9 Cal. App. 4th 1205, 1213 (1992).   Inequitable results flowing from the recognition of the corporate form include the frustration of a meritorious claim, perpetuation of a fraud, and the fraudulent avoidance of personal liability.  Hennessey's Tavern, Inc. v. American Air Filter Co., 204 Cal. App. 3d 1351, 1359 (1988).  California courts have held that the difficulty in collecting a judgment, as from an undercapitalized subsidiary, does not fulfill the requirement of injustice.  Virtualmagic Asia, Inc. v. Fil-Cartoons, Inc., 99 Cal. App. 4th 228, 245 (2002).

To hold Ms. Foster individually liable for each claim, PTS must plead an inequitable result *for each claim*.  When an individual is found to be the alter ego of a corporation, this does not dissolve the corporation.  Mesler, 39 Cal. 3d at 300.  Rather, to serve the ends of justice, the corporate entity is disregarded only in that limited circumstance, and "so far as there are any legitimate objectives to be gained by having two separate corporate entities, these remain undisturbed."  McLaughlin v. L. Bloom Sons Co., 206 Cal.App.2d 848, 854 (1962).  Without pleading an inequitable result each time, PTS does not show why the corporate entity of the Foster Group should otherwise be disturbed.  See Mesler, 39 Cal. 3d at 301 ("under certain circumstances a hole will be drilled in the wall of limited liability erected by the corporate form; for all purposes other than that for which the hole was drilled, the wall still stands").  To hold otherwise would ignore the presumption of corporate separateness and the essence of alter-ego theory.  See Mid-Century Ins. Co., 9 Cal. App. 4th at 1212 ("[i]t is the plaintiff's burden to overcome the presumption of the separate existence of the corporate entity").  Alter-ego theory is essentially an equitable tool used to vindicate the rights of those damaged by the abuse of the corporate form.  See Mesler, 39 Cal. 3d at 301; Kohn v. Kohn,

95 Cal. App. 2d 708, 718 (1950).  The requirement of an inequitable result ensures that the corporate form is disregarded only when justice so requires; to allow a single claim of abuse to bootstrap all other claims in a lawsuit would apply an equitable tool without showing that equity requires it.

            a.    First and Second Claims for Breach of Fiduciary Duty

        Plaintiff has not specifically pled why holding The Foster Group alone liable for the general breach of fiduciary duty or regarding the phantom GSA listings would promote injustice.  While the claim may state bad-faith conduct, it does not state how the corporate form was abused to perpetrate it.  On this pleading, Ms. Foster cannot be held liable in her individual capacity for breach of fiduciary duty (generally) or breach of fiduciary duty (phantom GSA listings) on an alter-ego theory of liability.[5]

            b.    Third Claim: Breach of Implied Covenant of Good Faith and Fair Dealing

        Similarly, Plaintiff has not pled why holding only The Foster Group liable for its alleged breach of the implied covenant of good faith and fair dealing and breach of contract promotes injustice.  On this pleading, Ms. Foster cannot be held liable in her individual capacity for breach of the implied covenant of good faith and fair dealing on an alter-ego theory of liability. Accordingly, the Court **GRANTS** Defendants' motion and the claim of breach of the implied covenant of good faith and fair dealing against Ms. Foster in her individual capacity is **DISMISSED without prejudice**.

            c.    Fourth Claim: Breach of Contract

        Plaintiff has not pled why it is necessary to hold Ms. Foster individually liable for the breach-of-contract claim to avoid injustice.  On this pleading, Ms. Foster cannot be held liable in her individual capacity for breach of contract on an alter-ego theory of liability.

_____

        [5]  This claim is not dismissed, however, because Plaintiff has may use corporate-director liability as a basis to sue Ms. Foster individually.  This is discussed in more detail below.

1  Accordingly, the Court **GRANTS** Defendants' motion and the claim of breach of contract

2  against Ms. Foster in her individual capacity is **DISMISSED without prejudice**.

3

4       d.    Fifth Claim: Fraud, and Sixth Claim: Intentional Interference with

5             Prospective Economic Advantage

6       Ms. Foster herself allegedly committed fraudulent acts and the intentional interference

7  with prospective economic advantage, so she can be held personally liable for them without

8  the use of the alter-ego theory.  The Court **DENIES** Defendants' motion to dismiss these

9  claims against Ms. Foster in her individual capacity.

10

11      f.    Seventh Claim: Trade-Secret Misappropriation and Unfair Competition

12      PTS shows that piercing the corporate veil is warranted regarding the

13 misappropriation-of trade-secrets and unfair-competition claims.  PTS  notes Foster's

14 uncooperativeness in returning proprietary information, and that Ms. Foster could technically

15 remain in compliance with the contract by not using the proprietary information as The Foster

16 Group while still retaining it as an individual.  (Compl. ¶ 64.)  Recognizing the corporate form

17 could deprive PTS of remedies to retrieve their proprietary information or enforce its non-use,

18 and the deprivation of remedies by the corporate form has been held to be exactly the type

19 of inequity that allows the application of alter-ego liability.  See Axon Solutions, Inc., 2010 WL

20 1797028, at *3 (deprivation of remedies by recognizing corporate form warrants application

21 of alter-ego liability).  Accordingly, the Court **DENIES** Defendants' motion to dismiss the

22 trade-secret misappropriation and unfair-competition claims against Ms. Foster in her

23 individual capacity.

24

25      g.    Eighth Claim: Rescission

26      "Rescission is *not* a cause of action; it is a remedy."  Nakash v. Superior Court, 196

27 Cal. App. 3d 59, 70 (1987) (emphasis in original); accord Tiqui v. First Nat'l Bank of Az., No.

28 09cv1750, 2010 WL 1345381, at *7 (S.D. Cal. Apr. 5, 2010); Watkinson v. MortgageIT, Inc.,

10cv0578 BTM (BLM)

1    No.10cv00327, 2010 WL 2196083,  at *4 (S.D. Cal. June 1, 2010).  The Court construes this

2    cause of action as a request for relief and declines to dismiss it.

3

4                  h.     <u>Ninth Claim: Declaration That No Future Compensation is Due to</u>

5                       <u>Defendants</u>

6       PTS seeks a declaratory judgment that no future compensation is owed to Defendants

7    under the contract.  Declaratory judgment is a remedy that is granted at the discretion of the

8    court.  <u>McGraw-Edison Co. v. Preformed Line Products Co.</u>, 362 F.2d 339, 342 (9th Cir.

9    1966).  Even though declaratory judgment is a remedy, it is often brought as an independent

10    claim or counterclaim with elements that must be proven.  <u>Classic Media, Inc. v. Mewborn</u>,

11    532 F.3d 978, 980 (9th Cir. 2008) (claim and counterclaim for declaratory judgment); <u>Mitchell</u>

12    <u>v. Riddell</u>, 402 F.2d 842, 844 (9th Cir. 1968) (two causes of action for declaratory judgment).

13    One of the elements considered by the court is whether a declaratory judgment will settle the

14    controversy at issue.  <u>McGraw-Edison Co.</u>, 362 F.2d at 342.  Because Ms. Foster allegedly

15    controls The Foster Group, the Court may issue a declaratory judgment that applies to both

16    Defendants regarding whether Plaintiff owes them any future compensation.  This claim can

17    be asserted against Ms. Foster directly and there is no need to show alter-ego liability.

18       The Court **DENIES** Defendants' motion to dismiss the declaratory-judgment claim

19    against Ms. Foster in her individual capacity.

20

21    2.     <u>Personal Liability of Corporate Directors</u>

22       Separate from alter-ego liability, PTS has also pled that Ms. Foster has committed

23    torts that would expose her to personal liability as a corporate director.  Corporate directors

24    may be held individually liable for tortious conduct that they authorized, directed, or

25    participated in.  <u>United States Liab. Ins. Co. v. Haidinger-Hayes, Inc.</u>, 1 Cal. 3d 586, 595

26    (1970).  Corporate directors may be held individually liable for tortious conduct regardless

27    of whether or not the conduct was performed on behalf of the corporation or whether the

28    corporation is held liable.  <u>Frances T. v. Village Green Owners Assn.</u>, 42 Cal. 3d 490, 504

(1986).  Plaintiff pleads  five tort claims: breach of fiduciary duty (generally), breach of fiduciary duty (phantom GSA listings), fraud, IIPEA, and trade-secret misappropriation and unfair competition.

PTS has pled that Ms. Foster is the sole actor of The Foster Group, Inc., so she was a participant in all alleged tortious conduct.

### i.      First Claim: Breach of Fiduciary Duty (Generally)

Defendants have not otherwise challenged the sufficiency of the pleading for the first claim.  Accordingly, Defendants' motion to dismiss the claim for breach of fiduciary duty (generally) against Ms. Foster in her individual capacity is **DENIED**.

### ii.      Second Claim: Breach of Fiduciary Duty (Phantom GSA Listings)

For the same reason, Defendants' motion to dismiss the second claim for breach of fiduciary duty (phantom GSA listings) against Ms. Foster in her individual capacity is **DENIED**.

### iii.      Fifth Claim: Fraud

The Court has already denied Defendants' motion to dismiss this claim against Ms. Foster in her individual capacity because Plaintiff asserts this claim against Ms. Foster directly.

### iv.      Sixth Claim: Intentional Interference with Prospective Economic Advantage

The only challenge to the sufficiency of the IIPEA pleading was addressed in section C.  IIPEA is tortious conduct, and as a participant in that conduct Ms. Foster can be held individually liable.  Accordingly, the court **DENIES** Defendants' motion to dismiss the IIPEA claim against Ms. Foster in her individual capacity.

//

//

1        v.      <u>Seventh Claim: Trade-Secret Misappropriation and Unfair Competition</u>

2        Defendants' motion to dismiss the claim against Ms. Foster in her personal capacity

3 for trade-secret misappropriation has already been denied because of a successful pleading

4 of alter-ego liability in section D(1)(ii)(f). Recognizing that Ms. Foster could be held

5 personally liable as a corporate director engaged in tortious conduct for trade secret

6 misappropriation would also be enough to defeat Defendants' motion to dismiss.

7

8                               **IV. CONCLUSION**

9        For the foregoing reasons, the Motion to Dismiss [Doc. 4] is **GRANTED in part** and

10 **DENIED in part.** The Court **DISMISSES without prejudice** the claims for breach of contract

11 and breach of the covenant of good faith and fair dealing against Ms. Foster in her individual

12 capacity. The Court declines to dismiss the claims for breach of fiduciary duty (generally),

13 breach of fiduciary duty (phantom GSA listings), fraud, IIPEA, and trade-secret

14 misappropriation and unfair competition against Ms. Foster in her individual capacity and the

15 claims for fraud and IIPEA against The Foster Group. The motion to dismiss for lack of

16 subject matter jurisdiction is **DENIED** as moot.

17 **IT IS SO ORDERED.**

18 DATED: August 24, 2010

19

20                            Honorable Barry Ted Moskowitz
                           United States District Judge

21

22

23

24

25

26

27

28

10cv0578 BTM (BLM)